**ASHLEY COUNTY MEDICAL CENTER, et al.,**
**Plaintiffs,**

v.

**Tommy G. THOMPSON, Secretary, United States Department of Health and Human Services, Defendant.**

**No. 4:02CV00127 GTE.**

United States District Court,
E.D. Arkansas,
Western Division.

May 13, 2002.

Diane S. Mackey, Friday, Eldredge & Clark, Little Rock, AR, William C. Crenshaw, Barbara D.A. Eyman, Powell, Goldstein, Frazer & Murphy, LLP, Washington, DC, for plaintiffs.

Gwendolyn Dewees Hodge, U.S. Attorney's Office, Eastern District of Arkansas, Little Rock, AR, Sheila M. Lieber, Peter Robbins, U.S. Department of Justice, Civil Division, Washington, DC, for Department of Health and Human Services, Secretary, Honorable Tommy G. Thompson, in his official capacity.

### MEMORANDUM OPINION AND ORDER

EISELE, District Judge.

The Plaintiffs—three individual hospitals, four national hospital associations and seven state hospital associations—filed this action, along with a motion for preliminary

and permanent injunction, against the Secretary of the Department of Health and Human Services ("the Secretary") on March 7, 2002. Cross motions for summary judgment have now been filed. Plaintiffs ask the Court to bar implementation and enforcement of new Medicaid regulations scheduled to take effect on May 14, 2002.[1] These regulations—codified at 42 C.F.R. §§ 447.272 and 42 C.F.R. 447.321—are known collectively as the 2002 Upper Payment Limit Rule.

The challenged regulation reduces the upper limit on what states may reimburse locally-owned public hospitals[2] for services to Medicaid beneficiaries and still receive federal matching funds. The Plaintiffs contend that the 2002 UPL will drastically impact states' abilities to channel much needed payments to locally-owned public hospitals, which treat large numbers of Medicaid, uninsured, and underinsured patients. In contrast, the Secretary contends that the challenged regulation closes a flagrant regulatory loophole that essentially allows states to improperly obtain excess federal matching funds through "kickback" procedures (described below) and then use such excess for non-Medicaid purposes. After a careful review of the entire administrative record, the supplemental materials submitted by the parties, the excellent briefs submitted by counsel and their impressive oral arguments, the Court has concluded that the Plaintiffs' motion for summary judgment must be denied and that the Defendant's motion for summary judgment should be granted.

## I. BACKGROUND: MEDICAID OVERVIEW

Medicaid is an entitlement program administered by the states but jointly financed by the federal and state governments. The Medicaid program was created in 1965 and is designed to furnish medical assistance to persons "whose income and resources are insufficient to meet the costs of necessary medical services." 42 U.S.C. § 1396. As the nation's largest means-tested health care financing program, its importance to the nation's health care system cannot be overstated.[3] However, despite the pro-

---

1. The challenged regulation was proposed on November 23, 2001, and finalized on January 18, 2002. It was originally scheduled to take effect on March 19, 2002. The Secretary later scheduled it to take effect on April 15, 2002. This Court, during the oral argument, found and concluded that the effective date is May 14, 2002, pursuant to the Congressional Review Act, 5 U.S.C. §§ 801–808.

2. As noted, the challenged regulation reduced the upper limit on what states may pay to a certain category of hospitals—locally-owned public hospitals. The parties frequently refer to this category of hospitals as "non-State government-owned or operated hospitals." These non-state government-owned or operated hospitals consist mainly of county and municipal hospitals. For ease of reference, the Court has referred to them throughout this Order as "locally-owned" or "city- and county-owned" hospitals.

3. The importance of Medicaid is readily apparent when one considers the shocking number of uninsured individuals living in the United States. According to statistics gathered by The Henry J. Kaiser Family Foundation, more than 38 million Americans were uninsured in 2000. See The Kaiser Commission on Medicaid and the Uninsured, *The Uninsured and Their Access to Health Care*, (Feb.2002), at http://www.kff.org/content/2002/142003/142003.pdf. Approximately 83 percent of the uninsured are members of working families—72 percent live in households with a full-time worker and 11 percent with a part-time worker. *Id.* Uninsured rates vary widely across states "largely due to differences in industries and employer-sponsored coverage, the share of families who live on low incomes, and the scope of state Medicaid programs." *Id.* Rhode Island has the lowest uninsured rate at 7 percent, and New Mexico has the highest at 27 percent. *Id.* These working uninsured individuals are ordinarily not entitled to benefits under Medicaid or any other program.

gram's singular position in American health policy—and perhaps in part because of it—the Medicaid legislation is a morass of arcane, vague, and incoherent rules and regulations, which in some cases provide little in the way of helpful guidance. Its complexity becomes readily apparent in a case such as this one, where the intricacies of the Medicaid system appear to allow different states to use a particular regulation for vastly different ends. Here, for instance, some states rely on the regulation to fund critical care for underserved communities, while others use the same regulation to artificially inflate the amount of federal Medicaid reimbursement to which they are entitled with no guarantee that such excess federal funds will be used for Medicaid purposes.

The Medicaid program is administered by the states under Medicaid state plans approved by the Secretary of the Department of Health and Human Services (HHS). Each state is required to establish a medical assistance plan (known as the "State Plan") which must describe eligibility standards, the scope of benefits, reimbursement methodologies and certain other details of that state's Medicaid program. With regard to reimbursement, the State Plan must describe the methodology used to pay providers, but it need not list amounts to be paid to specific individual providers. HHS reviews the various State plans and all subsequent amendments to ensure compliance with broad federal requirements outlined in the Medicaid statute and accompanying regulations. Most notably, State Medicaid plans must assure that payments to health-care providers "are consistent with efficiency, economy, and quality of care." 42 U.S.C. § 1396a(a)(30)(A). The plans must also be "sufficient to enlist enough providers so that care and services are available under the plan at least to the extent that such care and services are available to the general population in the geographic area." *Id.* In other words, Medicaid reimbursement must take into account the market-driven nature of our nation's health care system while balancing the need to safeguard against inappropriate and wasteful expenditures.

As noted, the Medicaid system is jointly financed by the federal and state governments, and, thus, differs from Medicare, which is financed solely by the federal government.[4] Essentially, the federal government reimburses the states for their Medicaid expenditures on the basis of a formula tied to the per-capita income in each state. The federal share of Medicaid expenditures, otherwise known as "federal financial participation," or "FFP," varies from a minimum of 50 percent to as much as 83 percent of a State's total Medicaid expenditures. Although the non-federal share of a state's Medicaid expenditures is frequently referred to as the "State share," it is important to note that the Medicaid statute requires only that each State plan "provide for financial participation by the State equal to not less than 40 per centum of the non-Federal share." 42 U.S.C. § 1396a(a)(2). In other words, the portion of a State's Medicaid expenditures not covered by federal matching funds is properly referred to as the "non-federal share." And, sixty percent of the non-federal share of a State's Medicaid expenditures may be funded by sources

---

4. Medicare is the federal health insurance program that covers 34 million Americans aged 65 and older and another 5 million younger adults with permanent disabilities. *See* The Henry J. Kaiser Family Foundation, *The Medicare Program: Medicare at a Glance*, (June 2001), at http://www.k ff.org/content/archive/1066/Medicare1066.pdf. Medicare is administered and financed by the federal government and serves all eligible beneficiaries without regard to income.

other than the State. It is this provision—42 U.S.C. § 1396a(a)(2)—combined with certain regulations discussed below—that has given States room to create the abusive financing schemes of which the Secretary complains.

## II. SAFETY NET HOSPITALS

As noted, Plaintiffs challenge a regulation known as the 2002 Upper Payment Limit Rule ("2002 UPL Rule" or "2002 Rule"). The 2002 UPL Rule reduces the maximum amount of Medicaid reimbursement that states can give to locally owned public health care providers and still receive federal matching funds. Plaintiffs contend that the 2002 UPL Rule, by reducing Medicaid reimbursement rates, drastically limits the states' ability to target supplemental payments to such locally owned hospitals, which comprise a significant percentage of the nation's "safety net hospitals" the loose term which generally refers to those hospitals that treat all patients without regard to their health status or their ability to pay. The premise is that these hospitals must make up for large amounts of uncompensated services in order to stay operational. In addition to high levels of uncompensated care, these hospitals typically have low private caseloads and, thus, are less able to shift the cost of uncompensated care to privately insured patients.[5]

States have taken advantage of numerous statutory and regulatory provisions in order to direct supplemental payments to safety net hospitals. One method of targeting such payments to safety net hospitals involves supplemental payments under Medicaid Upper Payment Limits—the type of payments that are at issue in

the instant litigation. Another method involves payments under a separate Medicaid statute to "disproportionate share hospitals," or "DSH" payments. The Secretary contends that the history of DSH payments is particularly relevant to this litigation because HHS has been forced to correct abuses within the DSH program that are similar in operation to the abuses which in large measure precipitated both the 2001 UPL Rule and the 2002 UPL Rule. Thus, the Court will briefly discuss the DSH program.

## III. THE DSH PAYMENT ADJUSTMENT

Since 1981, the Medicaid statute has directed States to set Medicaid payments rates that take into account "the situation of hospitals which serve a disproportionate number of low-income patients with special needs." 42 U.S.C. § 1396a(a)(13)(A)(iv). This requirement is commonly referred to as the Medicaid disproportionate share hospital (DSH) payment adjustment. As noted, DSH payments are designed to assist safety net hospitals in making up for high levels of uncompensated care. The DSH payments that States make to safety net hospitals also draw federal matching funds.

Because the states are responsible for funding a share of DSH payments, Congress assumed their generosity to DSH hospitals would be tempered by fiscal realities. Thus, DSH payments originally had no ceiling and were not subject to the "upper payment limits" that applied to other Medicaid payments. *See* 42 C.F.R. 447.272(c)(2)(stating that upper payment limits do not apply to DSH payments).

---

**5.** Safety net hospitals account for only two-percent of all hospitals in the United States, but they include numerous *types* of institutions, including state-owned hospitals, city- or county-owned hospitals, privately-owned hospitals, children's hospitals, teaching hospitals, small rural sole-community providers and large urban heath systems. As noted, the 2002 UPL Rule applies only to non-state government owned public hospitals (mostly county- and city-owned hospitals) which usually meet the definition of safety net hospitals.

This flexibility, however, resulted in what has been referred to as a "loophole" in the DSH Program that allowed states to increase their receipt of federal matching funds without a corresponding increase in state expenditures. The loophole typically operated as follows. A state would pay an excessively high DSH payment to a hospital. This would fix the amount of the federal matching contribution. But the hospital would then transfer back a portion of the DSH payment to the state through "donations," "taxes," or some type of intergovernmental transfer. The result was that the state could draw additional federal matching funds without having to contribute additional state money towards the DSH payments. Thus, states could make virtually unlimited DSH payments and, in the process, earn FFP dollars while requiring DSH hospitals to transfer back to the states most of the DSH payments that the state had provided.

Many states were initially slow to act on their ability to make DSH payments to hospitals in need of special assistance.[6] However, as states became increasingly aware of their ability to leverage additional federal matching funds through excessive DSH payments, the number of states with DSH programs increased rapidly during the late 1980s and early 1990s. According to the Defendant, the states' use of inflated DSH payments and resulting kickbacks grew significantly between 1989 and 1992

with the result that federal spending for DSH payments grew from $400 million to $16.5 billion during that time period.

In 1991, Congress passed legislation aimed at stopping states from so inflating DSH payments. This legislation was the Medicaid Voluntary Contributions and Provider–Specific Tax Amendments of 1991, Pub.L. No. 101–234, 105 Stat. 1793 (1991). This legislation (A) essentially banned provider "donation" programs; (B) reduced federal matching funds for any state with existing provider taxes that exceeded 25% of its Medicaid expenditures; (C) imposed criteria on allowable provider taxes that required that they be "broad based" and that the provider not be "held harmless" financially; and (D) capped DSH payments at roughly their 1992 levels under a new formula. Interestingly, although the 1991 legislation curtailed DSH payment growth, it actually allowed states that had been making excessive DSH payments to make significantly higher DSH payments subsequent to the 1991 legislation than states that had not established DSH programs prior to the legislation.

## IV. SUPPLEMENTAL PAYMENTS UNDER UPPER PAYMENT LIMITS

States also have found ways to use the Medicaid "upper payment limits," or UPLs, to create additional supplemental payments to safety net hospitals.[7] These

---

**6.** *See* Teresa A. Coughlin and David Liska, *The Medicaid Disproportionate Share Hospital Payment Program: Background and Issues,* found in the Administrative Record for 2002 Rule, at 173.

**7.** The UPL concept has not always been part of the Medicaid program. Prior to 1981, Medicaid employed a "reasonable cost" methodology of reimbursing hospitals for their costs of serving Medicaid beneficiaries. *See* Transcript of April 10, 2002 Hearing in this matter, at 20–22. In 1980 and 1981, however, Congress amended the Medicaid statute to

allow States greater flexibility in establishing reimbursement methodologies. *Id. See also* Omnibus Budget Reconciliation Act of 1980, Pub.L. 96–499 94 Stat. 2599; Omnibus Budget Reconciliation Act of 1981, Pub.L. 97–35, § 2173, 95 Stat. 357. In recognition of this greater flexibility, HHS enacted regulations setting upper payment limits on reimbursement in 1981. *See* Medicaid Program: Payment for Long–Term Care Facility Services and Inpatient Hospital Services, 46 Fed.Reg. 47964 (Sept. 30, 1981); *see also* 48 Fed.Reg. 56046 (Dec. 19, 1983). The purpose of the UPLs is to ensure that payments "are consis-

limits apply to payments for the services of inpatient hospitals, nursing facilities and intermediate-care facilities for the mentally retarded, and to payments for the services of outpatient hospitals and clinics. 42 C.F.R. §§ 447.272, 447.321. UPLs set a maximum amount that a state may pay to Medicaid providers and still receive federal matching funds. In other words, a state could conceivably make payments to providers in excess of the UPLs but it could not legitimately receive any federal matching contributions towards the excess amount.

## A. Medicaid UPL Prior to 1987: 100% Rule Applied Across All Types of Hospitals

Prior to 1987,[8] the UPL regulations required a state to assure "that its estimated average proposed payment rate" for inpatient or long-term care services was "reasonably expected" not to exceed in the aggregate the amount that the agency "reasonably estimat[ed] would be paid for the services under the Medi*care* principles of reimbursement." 42 C.F.R. § 447.253(b)(2) (1984) (emphasis added). The UPL applied in the aggregate to the three *categories* of health care facilities—that is, state-owned, locally-owned, and privately-owned. In other words, so long as a state's *aggregate* Medicaid payments did not exceed 100 percent of what would be paid for the same services pursuant to Medicare, the states were free to allocate payments among specific facilities, and/or specific categories of facilities, as they chose. States could, for instance, make higher payments to all government-owned hospitals at the expense of private hospitals, so long as the aggregate payments across all types of hospitals did not exceed 100 percent of Medicare payment principles. Similarly, a State could make higher

payments to government-owned long-term care facilities (i.e., government-owned nursing homes) at the expense of private long-term facilities, so long as the aggregate payments across all types of long-term facilities did not exceed 100 percent of Medicare payment principles.

## B. 1987 Revision: Separate UPL for State–Owned Hospitals and Long–Term Care Facilities

In 1987, HHS revised the UPLs for inpatient hospital and long-term care facility services into a two-tiered structure. One tier involved state-operated facilities, while the second tier included *all* three categories of facilities—state-owned, locally-owned, and privately-owned—combined. *See* 51 Fed.Reg. 5728 (February 18, 1986); 52 Fed.Reg. 28141, 28145 (July 28, 1987). More specifically, under the regime instituted in 1987, states were required to limit aggregate payments to *state-operated* facilities to 100 percent of Medicare principles. And states also were required to limit aggregate payments to all three categories of facilities *combined* to 100 percent of Medicare principles. This change was effectuated because there were no incentives for State-operated facilities to self-impose cost-constraining methodologies. In other words, because states were obligated to pay for the expenses of state-operated facilities, states had an incentive to increase Medicaid payments to these facilities *at the expense of* non-state facilities subject to the pre–1987 single aggregate limit.

The 1987 regulations reduced the ability of states to overpay their *own* hospitals and long-term care facilities at the expense of privately-owned or locally-owned facilities. But it left intact the ability of states to shift Medicaid payments to locally-

---

tent with efficiency, economy, and quality of care," as mandated by 42 U.S.C. § 1396a(a)(30)(A).

**8.** Again, the Court notes that UPLs were first implemented in 1981. *Supra* note 7.

owned (i.e., county- or city-owned) hospitals and long-term care facilities at the expense of private facilities so long as the aggregate 100 percent limit was respected. Accordingly, some states soon found a way to make intergovernmental transfers (IGTs) work for them in a way that closely resembled the donation and provider-tax DSH loopholes of the late 1980s and early 1990s. In particular, some states began to pay locally-owned facilities at rates exceeding their cost of serving Medicaid beneficiaries. These states would claim federal matching funds based on these "inflated" amounts, and the local facilities would then funnel some or all of the additional money back to the states through IGTs. In some instances, the money that was funneled back to the states through IGTs was used to increase care to underserved populations—not necessarily Medicaid populations—or to otherwise improve healthcare in these states. In other instances, however, states were using this money for purposes completely unrelated to health care.

### C. 2001 Regulations: 150 Percent Rule for Locally–Owned Hospitals

The continued flexibility that states had to abuse IGTs under the UPLs prompted HHS to consider additional changes to the UPL regulations. Specifically, HHS proposed regulatory changes on October 10, 2000, that were finalized on January 12, 2001, and became effective March 13, 2001. An understanding of these regulatory changes, collectively referred to as the 2001 UPL Rule, is particularly crucial to the instant litigation. Thus, the Court will discuss them in detail.

#### 1. *CMS Describes Potential for Abuse in Letter to States*

In the Summer of 2000, HHS notified States of its growing concern about abusive IGTs. Specifically, the changes effectuated in the 2001 150 percent rule were

foreshadowed in a letter to state Medicaid Directors from the Director of the Centers for Medicare & Medicaid Services ("CMS"), the agency responsible for administering Medicaid.[9] *See* Administrative Record of Rule Promulgated at 65 Fed. Reg. 3148 (2001 UPL Rule), Volume 1, at 41–44. This letter, dated July 26, 2000, reads, in relevant part as follows:

> It has come to our attention that some States are using the flexibility in setting the maximum rates that can be paid under the Medicaid program (the so-called "upper payment limits") to pay government-owned facilities at a rate far exceeding their cost of serving Medicaid beneficiaries so that the States can gain Federal Medicaid matching payments without new State contributions. I am writing to say that we intend to address this problem, and to outline our concerns and the process for addressing them.

> Background

> As you know, under current Federal regulations, States have great flexibility in setting the Medicaid rates that they pay to nursing homes and hospitals. These regulations do establish an overall maximum payment; States may pay facilities a total amount up to the level that Medicare would pay for the same services. However, it appears that some States are:

> ☐ calculating the maximum amount that, in theory, could be paid to each Medicaid facility (referred to as the "upper payment limit" or "UPL");

> ☐ adding these amounts together to create excessive payment rates to a few county or municipal facilities;

> ☐ claiming Federal matching dollars based on these excessive payment rates; and then

9. CMS was formerly known as the Health Care Financing Administration.

☐ directing these county or municipal facilities to transfer large portions of the excessive payments back to the State government.

It appears that many States allow their county-owned providers to keep only a small fraction of the Federal funds (less than five percent) that are used to provide these excessive "reimbursements." The practical outcome is that the States using this financing mechanism actually gain Federal matching payments without any new State financial contribution. This practice is not consistent with the intent of the Medicaid statute that specifies that provider payments must be economic and efficient. If a State requires facilities to refund its own Medicaid contribution, the practice also effectively undermines the requirement that a State share in the funding for its Medicaid program.

Moreover, this practice appears to be creating rapid increases in Federal Medicaid spending, with no commensurate increase in Medicaid coverage, quality, or amount of services provided. There is preliminary evidence that this current practice has contributed to a spike in Federal Medicaid spending. The States' estimates of Federal Medicaid spending for FY 2000 have already increased by $3.4 billion over earlier projections. We believe the $1.9 billion of this increase is likely due to the circulation of funds through the UPL loophole. The five-year cost of this growing State practice would be at least $12 billion, and there is an influx of new State proposals. Currently, 17 States have approved plan amendments and another 11 have submitted amendments. This could have the long-term effect of undermining the core mission and the broad-based support for Medicaid, which guarantees critical health services to our most vulnerable populations, low-income children and families, people with disabilities, and the elderly.

*Id.* at 41–42. The CMS Director noted that "[t]he excess Federal Medicaid payments that are shared with State and local governments are put to any number of uses—both health and non-health related." *Id.* at 42. More particularly, the Director noted that some states appeared to use part of the excess funds to pay for uncompensated care and to finance "other health programs." *Id.* The Director stated that this resulted in "Medicaid funding being used for otherwise laudable health care purposes ... but for people and/or services not eligible for Medicaid coverage." *Id.* In addition, the Director noted that "reports suggest that some States have gone so far as to use—or intend to use— the UPL arrangement for non-health purposes" such as filling budget gaps, reducing state debt, financing tax cuts, and financing education programs.

The Director's letter also informed States that the HHS Office of Inspector General was "conducting a review of UPL practices in a number of States and [would be] reporting on them soon." *Id.* at 43. In addition, the letter notified States that HHS was then developing a regulatory change intended to halt the abusive practices described in his letter and that a Notice of Published Rulemaking would be published forthwith. *Id.*

### 2. HHS Proposes and Finalizes 150 Percent Rule for Locally Owned Public Hospitals

As noted, the 2001 Rule was proposed October 10, 2000, and finalized on January 12, 2001 ("2001 Rule"). The Summary of the 2001 Rule as published in the Federal Register reads as follows:

SUMMARY: This final rule modifies the Medicaid upper payment limits for inpatient hospital services, outpatient hospital services, nursing facility ser-

vices, intermediate care facility services for the mentally retarded, and clinic services. For each type of Medicaid inpatient service, existing regulations place an upper limit on overall aggregate payments to all facilities and a separate aggregate upper limit on payments made to State-operated facilities. This final rule establishes an aggregate upper limit that applies to payments made to government facilities that are not State government-owned or operated, and a separate aggregate upper limit on payments made to privately-owned and operated facilities. This rule also eliminates the overall aggregate upper limit that had applied to these services.

With respect to outpatient hospital and clinic services, this final rule establishes an aggregate upper limit on payments made to State government-owned or operated facilities, an aggregate upper limit on payments made to government facilities that are not State government-owned or operated, and an aggregate upper limit on payments made to privately-owned and operated facilities.

These separate upper limits are necessary to ensure State Medicaid payment systems promote economy and efficiency. We are allowing a higher upper limit for payment to non-State public hospitals to recognize the higher costs of inpatient and outpatient services in public hospitals. In addition, to ensure continued beneficiary access to care and the ability of States to adjust to the changes in the upper payment limits, the final rule includes a transition period for States with approved rate enhancement State plan amendments.

66 Fed.Reg. 3148 (Jan. 12, 2001). The 2001 Rule effectuated the following UPL revisions. With regard to inpatient and long-term care services, the new regulation eliminated the aggregate UPL for all categories of facilities combined and replaced it with separate UPLs for *each* of the three categories of facilities. The UPL for state-owned facilities remained at a reasonable estimate of what would have been paid for those services under Medicare payment principles, i.e. at 100 percent. Likewise, the new UPL for private facilities was set at a reasonable estimate of what would have been paid for those services under Medicare payment principles, or 100 percent. Finally, the UPL for locally-owned public facilities also was set at 100 percent, with the following crucial exception—the UPL for locally-owned public *hospitals* was set at 150 percent.[10] In addition, the 2001 Rule effectuated a parallel set of limits for outpatient services.

### (a) Transition Periods

The 2001 Rule also established transition periods for States that had previously implemented UPL supplemental payment plans. Specifically, States that had previously obtained HHS approval of their supplemental payment plans were eligible for one of three transition periods, depending on the date of HHS approval. States that had implemented plans on or after October 1, 1999, were given until September 30, 2002, to comply with the new regulation. States that had implemented supplemental payment plans between October 1, 1992 and October 1, 1999 were subject to a five-year transition period mandating specific

---

**10.** As will be explained more thoroughly below, the 150 percent UPL in the 2001 Rule applied to locally-owned hospitals but not to other types of locally-owned facilities, such as nursing homes and intermediate care facilities for the mentally retarded. Nursing homes were excluded from the 150 percent provision in light of reports from the HHS Inspector General indicating that nursing homes were much more likely than hospitals to be transferring supplemental ·payments back to the States.

but gradual payment reductions. And, finally, states that had implemented supplemental payment plans before October 1, 1992, were subject to an eight-year transition period which also mandated gradual payment reductions.[11] As noted in the Federal Register, these transition periods were designed "to ensure continued beneficiary access to care and the ability of States to adjust to the changes in the upper payment limits." 66 Fed.Reg. 3148 (Jan. 12, 2001).

### (b) Reporting Requirements

The 2001 UPL Rule also contained new reporting requirements designed to aid the Secretary in ensuring proper use of the 150 percent rule by States. The reporting requirements obligated States with supplemental payment programs to identify (1) the total Medicaid payments made to each locally-owed hospital and (2) the reasonable estimate of the amount that would be paid for the services furnished by each hospital under Medicare payment principles. As noted in the Federal Register, "[t]he purpose of this requirement was to ensure the higher payments are appropriate and are being fully retained by hospitals." 66 Fed.Reg. 3158. The then Secretary described the reporting requirements as "a necessary administrative tool to ensure the proper administration of the Medicaid program." *Id.* Unfortunately, there was no follow-through to actually establish an effective reporting system. *See infra.*

### 3. *The Motivations and Concerns Behind the 2001 Rule*

Interestingly, the rule-making record reveals that the 150 percent rule for locally-owned hospitals was the product of conflicting concerns. First, as noted, HHS believed that the then-UPLs allowed too much potential for abusive IGTs—that is, IGTs designed to inflate a state's federal matching rate thereby freeing up state funds for other purposes. Indeed, in proposing the 2001 Rule, HHS set forth the following description of the potential for abuse:

It has become apparent that the current regulation creates a financial incentive for States to overpay non-State-operated government facilities because States, counties, cities and/or public providers can, through this practice, lower current State or local spending and/or gain extra Federal matching payments. This practice is not consistent with [the] Medicaid statute and has contributed to rapidly growing Medicaid spending.

The incentive and ability for States to pay excessive rates to non-State government-owned or operated Medicaid providers can be explained as follows. As stated previously, the current aggregate upper payment limit is applied to both private and non-State government-owned or operated facilities. By developing a payment methodology that sets rates for proprietary and nonprofit facilities at lower levels, States can set rates for county or city facilities at substantially higher levels and still comply with the current aggregate upper payment limit. The Federal government matches these higher payment rates to public facilities. Because these facilities are public facilities, funds to cover the State share may be transferred from those facilities (or the local government units that operate them) to the State, thus

---

**11.** The transition periods changed considerably from the October 10, 2000 NPRM. *See* 65 Fed.Reg. 60151, 60154. These changes were made, at least in part, pursuant to congressional direction contained in the Medicare, Medicaid, and SCHIP Benefits Improvement and Protection Act of 2000 (BIPA). BIPA, which was passed subsequent to the NPRM but prior to the promulgation of the 2001 Rule, provided for a longer transition period for States that had an approved State plan provision or methodology in effect on October 1, 1992.

generating increased Federal funding with no net increase in State expenditures. This is not consistent with the intent of statutory requirements that Medicaid payments be economical and efficient.

65 Fed.Reg. 60152 (Oct. 10, 2000).

At the same time, HHS recognized the value of public hospitals' services to Medicaid and the financial pressures facing public hospitals due to their large indigent patient base. Again, the Court notes the following excerpt from the October 10, 2000, Notice of Proposed Rulemaking ("NPRM"):

We are proposing a higher upper payment limit for services in non-State-owned or operated public hospitals operated by governmental entities other than the State itself because we believe that allowing higher Medicaid payments will fully reflect the value of public hospitals' services to Medicaid and the populations it serves. Public hospitals are established to ensure access to needed care in underserved areas, and often provide a range of care not readily available in the community, including expensive specialized services, such as trauma and burn care and outpatient tuberculosis services. They also provide a significant proportion of the uncompensated care in the nation.

The size and scale of public hospitals create extreme stresses and uncertainties, especially given their dependence on public funding sources. *We are concerned that these stresses may threaten the ability of these public hospitals to fulfill their mission and fully serve the Medicaid population.* As such, we are proposing a higher UPL for these facilities. Specifically, this higher aggregate

UPL would allow States to pay non-State-owned or operated public hospitals up to 150 percent of the amount that would have been paid for inpatient and outpatient services using Medicare payment principles.

65 Fed.Reg. 60151, 60153 (Oct. 10, 2000) (emphasis added). Thus, the 150 percent rule for locally-owned hospitals reflected the fragile financial position of many of these hospitals as well as their importance to the communities they serve. Importantly, however, the NPRM also recognized a potential for continued abuse under the 150 percent rule.

We also recognize that, in some instances, these public hospitals may be required by State or local governments to transfer back a portion of payments that they receive under Medicaid. *This practice raises serious concerns about whether the purposes of the higher payment limits being proposed for public hospitals will be met.* To ensure that higher payment levels will assist in ensuring the stability of public hospitals as a vital link in the resources available for care to Medicaid beneficiaries, we intend to require in our final rule that *payments made to public hospitals under this provision be separately identified and reported* to [CMS]. We request comment on the most suitable ways of reporting and accounting for these payments. In addition, we are soliciting comments on whether the 150 percent limit is appropriate.

*Id.* (emphasis added). Defendant refers to the 150 percent rule as a "controversial compromise in which the previous Secretary recognized that significant potential for abusive governmental transfers remained." [12]

---

12. In announcing the finalized 2001 Rule, HHS again referred to the financial pressures facing locally-owned hospitals. The Court notes the following excerpts from the Federal Register:

 • We are allowing a higher upper limit for payment to non-State public hospitals to

### 4. *Findings of the OIG Audits*

The most crucial aspect of the 2001 rule-making record was the collective findings of the HHS Inspector General (OIG). The publication of the finalized 2001 Rule included the following reference to said findings:

As of December 22, 2000, the OIG had completed six substantial reviews in five States. Although the specifics of the enhanced payment programs and associated financing mechanisms differed somewhat in each State reviewed, the OIG found that payment programs share some common characteristics. These similarities are included below.

• In general, enhanced payments to city and county government owned providers were not based on the actual cost of providing services to Medicaid beneficiaries, or directly related to increasing the quality of care provided by the public facilities that received the enhanced payments.

• Enhanced payments to public nursing facilities were not being retained by the facilities to provide services to Medicaid beneficiaries. Instead, the majority of

the enhanced payment was returned by the providers to the States through intergovernmental transfers (IGT). The States then used the funds for other purposes, some of which were unrelated to the Medicaid program.

• Unlike the nursing facilities, public hospital providers retained the majority of the Medicaid enhanced payments. However, the portion of the funds that hospitals returned to the States through IGTs resulted in millions of dollars available to the States for other uses.

• While the public hospital providers served a large number of Medicaid beneficiaries and uninsured patients, the hospitals either (1) did not receive Medicaid disproportionate share hospital (DSH) payments from the States, or (2) returned the majority of the Medicaid DSH payments to the States through IGTs. It appears, for these providers, that States used enhanced payments in the place of DSH payments, although Medicaid DSH payments are designed to help hospitals that provide care to a large number of Medicaid beneficiaries and uninsured patients.

66 Fed.Reg. 3148, 3150.[13] In particular, the 2001 rule-making record included the

---

recognize the higher costs of inpatient and outpatient services in public hospitals. 66 Fed.Reg. 3148.

• Although we realize there is an ancillary benefit [to the 150 percent rule] that may cover the costs of providing uncompensated care in these facilities, that was not the reason for our decision to set a higher UPL for these providers. We were more concerned with assuring the continued existence and stability of these core providers who serve the Medicaid population. 66 Fed.Reg. 3154.

At the same time, HHS also emphasized that hospitals "should retain the entire amount of the State and federal payments they receive to cover the cost of providing services to Medicaid and indigent patients." 66 Fed.Reg. 3154. Again, the Court notes the following excerpt:

[W]e have made every reasonable effort to assure that we pay these facilities only what

is necessary to meet the demand for service for Medicaid individuals. We intend to monitor payments to these providers closely and propose further refinements as we gain experience with the new UPLs. Should we find that payments made under the higher limit are not being retained by hospitals to support Medicaid services, we would be open to making further revisions in subsequent rulemaking.

*Id.*

**13.** Also included in the 2001 rulemaking record are presentations made by representatives of the HHS Office of Inspector General and the General Accounting Office (GAO) before the Senate Finance Committee. The testimony of the Principal Deputy Inspector General pertained to supplemental payments to county-owned nursing homes. *See* Testimony of Michael F. Mangano, Principal Deputy Inspector General, Department of Health and

following draft reports from the HHS Inspector General:

(1) Draft Report A–03–00–00203, Review of the Commonwealth of Pennsylvania's Use of Intergovernmental Transfers to Finance Medicaid Supplementation Payments to County Nursing Facilities, (August 2000);

(2) Draft Report A–04–00–02165, Review of Medicaid Enhanced Payments to Public Providers and the Use of Intergovernmental Transfers by the Alabama State Medicaid Agency (August 2000);

(3) Draft Report A–07–00–2076, Review of Medicaid Enhanced Payments to Public Providers and the Use of Intergovernmental Transfers by the State of Nebraska (August 2000);

(4) Draft Report A–10–00–00011, review of Medicaid Supplemental Payments to Public Hospital District Nursing Facilities and the Use of Intergovernmental Transfers by Washington State (September 2000);

(5) Draft Report A–05–00–00056, Review of Illinois' Use of Intergovernmental Transfers to Finance Enhanced Medicaid Payments to Cook County for Hospitals Services (November 2000);

(6) Draft Report A–04–00–02169, Review of Medicaid Enhanced Payments to Public Hospital Providers and the use of Intergovernmental Transfers by the Alabama State Medicaid Agency (November 2000).

The Court notes some of the OIG's conclusions contained in these Draft Reports:

● The use of IGTs as part of Pennsylvania's nursing home supplementation payment program "is a financing mechanism designed solely to maximize Federal Medicaid reimbursements, thus effectively avoiding the Federal/State matching requirements." Since State Fiscal Year 1992, Pennsylvania's Department of Public Welfare received $3.1 billion in Federal matching funds based on a reported $5.5 billion in supplemental payments to county nursing facilities. The reported supplementation payments were never directly made to the county nursing facilities that were supposedly to receive these payments, but, instead, never left the bank that processed the supplemental payment transactions. In State Fiscal Years 1997–1999, about 21 percent of the FFP generated by the IGT transactions was not budgeted for Medicaid purposes and another 29 percent was unbudgeted and available to Pennsylvania for non-Medicaid related use.[14]

Human Services, before the Senate Finance Committee, "Medicaid: Manipulation of Upper Payment Limit Requirements to Increase Federal Funds to States" (Sept. 6, 2000) (Rulemaking Record for 2001 Rule, at 1310–1319). He described the preliminary findings of the audits of supplemental payments to locally-owned nursing homes in Pennsylvania, Alabama and Nebraska. *Id.* He testified that the combination of supplemental payments and IGTs "has produced an abusive scenario" in which some States redirect the Federal Medicaid funds generated from this scheme to other Medicaid services or non-Medicaid programs. *Id.*

Kathryn G. Allen, GAO's Associate Director of Health Financing and Public Health Issues, testified that the combination of UPLs and IGTs was allowing States to create financing

schemes that allowed them to "supplant state Medicaid dollars with federal Medicaid dollars." *See* Testimony of the General Accounting Office Before the Committee on Finance, U.S. Senate, "Medicaid: State Financing Schemes Again Drive Up Federal Payments," at 10 (Sept. 6, 2000) (Rulemaking Record for 2001 Rule, at 1325–1337, 1336). Ms. Allen recommended that HHS adopt a separate UPL on local government entities. *Id.* Interestingly, she also recommended that Congress enact legislation prohibiting Medicaid payments that exceed costs to any government-owned facility. *Id.*

**14.** *See* Administrative Record for 2001 Rule, Volume III, at 1341–1356. The Draft Report set forth the following description of an IGT within Pennsylvania's program during 1999:

● Alabama's use of supplemental payments to "rural government owned" nursing homes were "not based on their actual cost of providing services to Medicaid beneficiaries or directly related to increasing the quality of care provided by public facilities." In addition, the nursing homes transferred 96.5 percent of the supplemental payments back to Alabama's Medicaid agency. The payments returned to the State agency were deposited into a special revenue fund—the main fund of three funds used by the State to pay Medicaid expenses. Upon deposit, the enhanced payment funds lost their identity. Thus, the OIG was unable to determine exactly how Alabama spent the enhanced payments, but it "is clear that in effect the use of the enhanced payments resulted in Federal funds being used to obtain additional Federal funds." [15]

● For Fiscal Years 1998 through 2000, Nebraska made enhanced payments to locally-owned nursing facilities totaling $227 million, generating about $139 million in Federal financial participation. Of the $227 million, providers retained about $1.5 million and about $225.5 million was returned to the State for other uses. For the funds transferred back to the State, the State share of the enhanced payments, totaling about $88

million, was returned to the Nebraska General Funds and the remaining $137.5 million in Federal matching funds was designated for the Nebraska Health Care Trust Fund. [16]

● During State Fiscal Year 2000, Washington State distributed supplemental payments of $147 million to "Public Hospital District (PHD) nursing facilities meeting certain eligibility criteria." These supplemental payments generated $76.2 million in federal matching funds. Of the $147 million distributed, $127 million was returned to the State by the PHD nursing facilities in the form of an IGT. The remaining $20 million was shared "among 14 eligible PHD nursing facilities and other health-related organizations." The funds returned to the State were deposited in "the State's health services account" which is used for "(i) maintaining and expanding access for low-income residents to health care services; (ii) maintaining and improving the capacity of the health care system (iii) containing health care costs; and (iv) regulating, planning, and administering the health care system." Thus, although the PHD nursing facilities retained only a small portion of the supplemental payments, "most of the [supplemental] funds was either designated or

As part of the supplementation payment process, each year DPW determined the available funding pool by calculating the amount of Medicaid funds available under the upper limit regulations. It then entered into an agreement with CCAP [the County Commissioners Association of Pennsylvania] whereby the counties borrow funds from a single bank using tax and revenue anticipation notes which may be equal to the total amount of the funding pool. The county funds maintained at that bank were then transferred to a DPS bank account, also at that bank, as the initial source to fund the pool. Within 24 hours of receipt, DPW transferred the amount received from the counties, plus a $1.5 million program

implementation fee, back to the county bank accounts as Medicaid supplementation payments for nursing facility services. The counties then forwarded the program implementation fee to CCAP. The counties used the supplementation payments to pay the bank notes. The DPW reported the supplementation payments to [CMS] as county nursing facility supplemental payments and claimed FFP.
Administrative Record for 2001 Rule, at 1346.

15. *See* Administrative Record for 2001 Rule, Volume III, at 1361–71.

16. *See* Administrative Record for 2001 Rule, Volume III, at 1375–84.

used for State health care needs, regardless of a person's Medicaid eligibility." [17]

• Illinois paid enhanced payments to three hospitals administered by Cook County—Cook County Hospital, Oak Forest Hospital, and Provident Hospital—and associated clinics administered by Cook County. During the period from July 1, 1991 through June 30, 2000, the Illinois Department of Public Aid (IDPA) made about $5.9 billion of enhanced payments to Cook County for inpatient, outpatient, and clinic services under the Medicaid program. About $3.0 billion of the $5.9 billion represented a payback of funds that were initially transferred as IGTs from Cook County to IDPA. The remaining $2.9 billion represented the Federal share of the payments. About $866.6 million of the $2.9 billion was returned by Cook County to IDPA and deposited to the State's General Revenue Fund. The IDPA contended that it used the returned funds for health-related services, but the OIG was unable to confirm this contention.[18]

• The State of Alabama made inpatient hospital enhancement payments to both State owned and local government owned facilities totaling approximately $465 million for the period from October 1, 1996 through July 31, 2000. OIG audited about $432 million of this total, of which the Federal share was about

$302 million. Of the Federal share, the hospitals retained about $216 million, and about $86 million was returned to the State agency. The funds returned to the State were deposited into a special revenue fund that was used to pay Medicaid expenses.[19]

## V. THE CHALLENGED REGULA-TION: The 2002 One Hundred Percent Rule

Of course, this case pertains to the most recent revision to the UPL regulations—the 2002 UPL Rule. The 2002 UPL Rule eliminates the 150 percent limit applicable to locally-owned hospitals that was adopted as part of the 2001 Rule and replaces it with the same 100 percent rule applicable to all other facilities. The 2002 UPL Rule was proposed on November 23, 2001—roughly eight months after the 2001 Rule became effective. It was finalized on January 18, 2002. The summary of the finalized rule as published in the Federal Register reads as follows:

This final rule modifies the Medicaid upper payment limit (UPL) provisions to remove the 150 percent UPL for inpatient hospital services and outpatient hospital services furnished by non-State government-owned or operated hospitals. *This final rule is part of this Administration's efforts to restore fiscal integrity to the Medicaid program and*

---

**17.** *See* Administrative Record for 2001 Rule, Volume III, at 1387–97.

**18.** *See* Administrative Record for 2001 Rule, Volume III, at 1406–1417. The OIG noted that Medicaid enhanced payments made to Cook County facilities during Fiscal Year 1999 were about $244.4 million more than the total operating expenses of these facilities. *Id.* at 1407. Cook County used the excess payments to "cover costs that would not otherwise qualify for Medicaid funding." *Id.*

The OIG also noted that the IDPA's use of IGTs to finance Medicaid enhanced payments

to Cook County for inpatient and outpatient hospital services increased significantly since the State began making enhanced payments in 1991. Specifically, the OIG reported that the IDPA made enhanced payments of about $133 million to Cook County during the first year of the IGT funding mechanism. During State Fiscal Year 2000, IDPA's enhanced payments to Cook County exceeded $1.1 billion. *Id.* at 1410.

**19.** *See* Administrative Record for 2001 Rule, Volume III, at 1421–1431.

*reduce the opportunity for abusive funding practices based on payments unrelated to actual covered Medicaid services.*

67 Fed.Reg. 2602–03 (Jan. 18, 2002) (emphasis added).

### A. HHS' Stated Rationale For 2002 UPL Rule

In its Notice of the finalized rule, HHS briefly revisited the changes implemented by the 2001 Rule and, in particular, the 150 percent limit for locally-owned public hospitals. The Court notes the following excerpt:

In a final rule published on January 12, 2001, in the Federal Register (66 F.R. 3148). we revised the Medicaid UPL for inpatient and outpatient hospitals to require separate UPLs for State-owned or operated facilities, non-State government-owned or operated facilities, and privately owned and operated facilities. In that final rule, we also created an exception for payments to non-State government-owned or operated hospitals. That exception provided that the aggregate Medicaid payments to those hospitals may not exceed 150 percent of a reasonable estimate of the amount that would be paid for the services furnished by these hospitals under Medicare payment principles. *At that time, we believed that payments to these public hospitals needed a higher UPL because of their important role in serving the Medicaid population.*

*Based on further analysis, we do not believe that a higher UPL is necessary to achieve the objective of assuring access for Medicaid patients to the services of public hospitals.*

67 Fed.Reg. 2602, 2603 (Jan. 18, 2002) (emphasis added). HHS listed the following factors in support of its conclusion that the 150 percent rule was not needed:

● We believe that the 100 percent UPL is more than sufficient to ensure adequate access to services for Medicaid beneficiaries at public hospitals. Under this limit, States may pay public providers up to 100 percent of a reasonable estimate of what Medicare would have paid for services provided to Medicaid beneficiaries. States also retain some flexibility to make enhanced payments to selected public hospitals under the aggregate limit.

● We do not believe that the higher payments are necessarily being used to further the mission of these hospitals or their role in serving Medicaid patients. The OIG has issued several reports demonstrating that a portion of the enhanced payments made as part of the UPL process are being transferred directly back to the State via intergovernmental transfers and used for other purposes (which may include funding the State share of other Medicaid expenditures). In cases for which hospitals did retain UPL-related enhanced payments, the OIG found that these same hospitals either did not receive disproportionate share hospital (DSH) payments or if they did, typically returned the DSH payments directly back to the State through intergovernmental transfers. We believe that Medicaid provisions permitting enhanced payments to disproportionate share hospitals should be sufficient to ensure that Medicaid beneficiaries have access to the services of these hospitals.

● Many of the public safety net hospitals affected by this rule qualify as DSH hospitals. The Medicare, Medicaid, and SCHIP Benefits Improvement and Protection. Act of 2000 (BIPA), enacted on December 21, 2000, provides additional funding to public hospitals by increasing the hospital-specific DSH limits originally set under the Omnibus Budget Reconciliation Act of 1993. States will have the ability to make Medicaid DSH payments to public hospitals up to 175 per-

cent of a hospital's reasonable costs of treating the uninsured and Medicaid beneficiaries for a period of two State fiscal years beginning after September 30, 2002.

● We wish to restore payment equity among hospital providers and across other provider types.

*Id.* at 2603.

### B. OIG's September 11, 2001 Report

As with the 2001 Rule, a most crucial aspect of the 2002 UPL rule-making record was the collective studies and analyses of the OIG. On September 11, 2001, the Principal Deputy Inspector General released a final report titled Review of Medicaid Enhanced Payments to Local Public Providers and the Use of Intergovernmental Transfers.[20] The report consolidated the results of seven OIG audits, conducted in six States, of Medicaid enhanced payments to locally-owned facilities and the use ofIGTs.[21] The Court notes the following language included in the memorandum transmitted with said report:

In Federal Fiscal Year 2000, 28 States made or planned to make at least $10.3 billion in Medicaid enhanced payments which included $5.8 billion in Federal matching funds. Prior to 1999, only 12 States had enhanced payment programs. If not brought under control, the rapid growth of these enhanced payment programs threaten the financial stability of the Medicaid program.

Our audits of seven enhanced payment programs in six States found that the enhanced payments to local government-owned providers were not based on the actual cost of providing services to Med-

icaid beneficiaries, nor did we find a direct relationship in the use of these funds to increase the quality of care provided by these public facilities. We also found that a large portion of the enhanced payments were not retained by the nursing facilities to provide services to resident Medicaid beneficiaries. Instead, some or most of the funds were transferred back to the States for other uses. Some of the funds transferred back to the State governments were earmarked for use in health care related service areas but not necessarily for Medicaid covered services approved in the State plans.

In contrast to nursing facilities, hospital providers kept a large portion of the enhanced payments. However, the hospitals either did not receive Medicaid disproportionate share hospital (DSH) payments from their State, or returned the majority of the Medicaid DSH payments to their State through IGTs. It appears, for these providers, that States have used enhanced payments in place of DSH payments, although Medicaid DSH payments are intended to help hospitals that provide care to a large number of Medicaid beneficiaries and uninsured patients.

For the portion of the enhanced payments that was returned to the States, it appears that the States did not incur a health care expenditure for which Federal matching funds were claimed. This condition draws into question whether the amounts returned to the State agencies constitute a refund required to be reported as other collections, and consequently offset against expenditures re-

---

**20.** *See* Administrative Record for 2002 UPL Rule, Volume I, at 19–49.

**21.** As noted *infra,* the OIG's final report was based on the same six audits detailed in the draft reports contained in the Rulemaking Record for the 2001 UPL Rule, plus one addi-

tional audit. Importantly, only three of the seven audits were of Medicaid enhanced payments to hospital providers. The other four audits were of Medicaid enhanced payments to nursing facility providers (i.e., nursing homes).

ported to [CMS]. As is, State agencies have developed mechanisms to obtain Federal Medicaid funds without committing the States' share of required matching funds.

Our review concluded that the States' use of the IGT as part of the enhanced payment program was a financing mechanism designed to maximize Federal Medicaid reimbursements, thus effectively avoiding the Federal/State matching requirements. The States were clear winners because they were able to reduce their share of Medicaid costs and cause the Federal Government to pay significantly more than it should for the same volume and level of Medicaid services.

Memorandum from Michael F. Mangano, Principal Deputy Inspector General, dated September 11, 2001, at 1–2.[22] The OIG then detailed the changes implemented in the 2001 Rule and noted that these changes were projected to "save $55 billion in Federal Medicaid funds over the next 10 years." *Id.* at 3. However, the OIG emphasized that the 2001 Rule "will only limit, not eliminate, the amount of financial manipulation of the Medicaid program the States can perform because the regulation did not require that the enhanced funds be retained by the targeted facilities to provide medical services to Medicaid beneficiaries." *Id.* The OIG further noted that "we do not believe the higher payment limit for non-State-owned government hospitals has been adequately supported through an analysis of these hospitals' financial operations." *Id.* The OIG then recommended that CMS take the following actions:

1. Annually audit the accuracy of the States' upper payment limit calculation and enhanced payments to ensure that the expected savings of $55 billion are realized.

2. Provide States with definitive guidance on calculating the upper payment limit so that there is a uniform standard applicable to all States. We believe this should include using facility-specific upper payment limits that are based on actual cost report data.

3. Require that, for States to seek Federal financial participation (FFP) to match State enhanced payments, they must demonstrate that the enhanced payments were actually made available to the facilities and the facilities used the funds to furnish Medicaid approved services to Medicaid eligible beneficiaries.

4. Require that the return of Medicaid payments by a county or local government to the State be declared a refund of those payments and thus be used to offset the FFP generated by the original payment.

5. Reconsider capping the aggregate upper payment limit at 100 percent for all facilities rather than the 150 percent allowance for non-State-owned government hospitals.

6. Seek authority to eliminate or reduce the transition periods included in the new upper payment limit regulations.

*Id.* In sum, the OIG's final report concluded that "[t]he States' use of the IGT as part of the enhanced payment program is a financing mechanism designed to maximize Federal Medicaid reimbursements, thus effectively avoiding the Federal/State matching requirements. The combination of enhanced payments and IGTs has become a financial windfall for States."[23]

---

22. A copy of the memorandum transmitted with the OIG's final report is included in Administrative Record for the 2002 Rule, Volume I, at 15–18.

23. Administrative Record for 2002 Rule, Volume 1, at 22. The OIG's final report noted that the specifics of the enhanced payment programs and the associated financing mech-

The OIG further concluded that the changes implemented pursuant to the 2001 UPL Rule "do not go far enough in protecting the financial integrity of the Medicaid program."[24]

### C. Transition Periods Contained in 2002 Rule: More Dramatic Drop-offs

The 2002 UPL Rule adopted the same transition periods that were adopted pursuant to the 2001 Rule. 67 Fed.Reg. 2603–04. However, whereas the 2001 Rule required states entitled to transition periods to be in full compliance with the 150 percent rule at the end of said periods, the 2002 Rule requires states to be in full compliance with the 100 percent rule at the end of their respective transition periods. *Id.* In other words, the 2002 UPL Rule imposes a steeper, or more dramatic, drop-off.

### VI. THE PARTIES' ARGUMENTS

As noted, the Plaintiffs ask the Court to bar implementation of the 2002 UPL Rule. Essentially, the Plaintiffs make the following arguments: (1) the 2002 UPL Rule does not include a concise statement of basis and purpose as mandated by the Administrative Procedure Act; (2) the 2002 UPL Rule is arbitrary, capricious and an abuse of the Secretary's discretion, and, thus, it must be overturned pursuant to the Administrative Procedure Act; and (3) the 2002 UPL Rule violates the Regulatory Flexibility Act and the Social Security Act.

In response, the Secretary contends that the 2002 UPL Rule corrects deficiencies in the 2001 Rule and, in the process, eliminates a. gaping loophole in the Medicaid funding system. The Secretary argues that the 2002 Rule will limit the ability of States to abuse the Medicaid system through the creative financing schemes described in the CMS letter of July 26, 2000 and the OIG's reports and, thus, the 2002 Rule will thereby strengthen the integrity of the Medicaid system and protect the federal fisc. More specifically, the Defendant makes the following arguments: (1) the 2002 UPL Rule is a product of reasoned rule-making and is a rational response to the 2001 Rule, which left too much potential for abuse on the part of the states; (2) the 2002 UPL Rule contains an adequate statement of basis and purpose; and (3) the Defendant conducted both an initial and a final regulatory flexibility analysis in compliance with the Regulatory Flexibility Act.[25]

anisms varied somewhat in the six States it audited. However, each States made enhanced payments through the use of a "funding pool." The Court notes the following explanation included in the OIG's report:

Each State created a funding pool to provide Medicaid enhanced payments to local government-owned providers. In general, the funding pools were calculated by determining the difference between the upper payment limit (based on Medicare payment principles) and the allowable Medicaid payments for each facility in the State. The combined total of the differences for all facilities in the State represented the funding pool. The total pool was distributed to the local providers (as an enhanced payment) based on the proportionate number of Medicaid beneficiary days at each facility. Except for hospitals in North Carolina, once each provider received the enhanced payment (Federal and State share), a portion of the funds was transferred back to the State for other uses or returned to its original source.

OIG's Final Report, at 3. Administrative Record for 2002 Rule, Volume I, at 27.

**24.** Administrative Record for 2002 Rule, Volume 1, at 22.

**25.** The Secretary also has argued that this Court lacks subject matter jurisdiction over all of the Plaintiffs' claims due to lack standing and lack of ripeness. In order to have standing, plaintiffs must establish, among other things, that they face injury fairly traceable to the challenged action of the defendant. The injury must be "actual or imminent" and not merely "conjectural or hypothetical."

## A. Standard of Review

 The Court will discuss the parties' arguments in turn, but first the Court will note the applicable standard of review. Because the 2002 UPL Rule was promulgated pursuant to the informal rulemaking procedures of section 553 of the Administrative Procedures Act, the Court must determine if the Rule is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).[26] The rescission or modification of a rule is subject to this standard. *Motor Vehicle Manufacturers Ass'n. v. State Farm Mutual Automobile Insurance*

*Vermont Agency of Natural Resources v. United States ex rel. Stevens*, 529 U.S. 765, 771, 120 S.Ct. 1858, 146 L.Ed.2d 836 (2000) (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 155, 110 S.Ct. 1717, 109 L.Ed.2d 135 (1990)). The Defendant contends that the Plaintiffs lack standing because the Secretary's promulgation of the 2002 UPL Rule does not affect Plaintiffs directly; rather, it affects them "only indirectly as filtered through the medium of independent financing decisions by the individual states in which they are located." The Defendant also emphasizes that the 2002 UPL Rule sets aggregate limits for all institutions that fall within a particular category. Thus, states retain some flexibility to make enhanced payments to selected locally-owned hospitals under the aggregate limit. Defendant argues that this matter is not ripe for review until states exercise their discretion in allocating Medicaid funds among locally-owned hospitals.

In response, Plaintiffs contend that they, as participants in the Medicaid system, are directly affected by the 2002 UPL Rule, which will drastically impact the compensation that providers receive. The Plaintiffs note *National Association of Chain Drug Stores, Inc. (NACDS) v. Bowen*, 1989 WL 43948 (D.D.C. 1989). That case involved a challenge by a trade association representing chain drug stores to the promulgation of prescription drug reimbursement regulations under Medicaid. *Id.* at *1. The challenged regulations revised the manner in which the upper limits for drug reimbursement are set. *Id.* The Defendant argued that the plaintiff did not have standing because the states, and not the federal government, determine the amount of reimbursement to providers of prescription drugs, and so long as states stayed below the aggregate limits, they would not have to change their compensation methodologies under the challenged regulations. *Id.* at *3. The district court soundly rejected the argument. The Plaintiffs in this case note the following language from *Bowen:*

While the challenged rule may not require states to change their reimbursement methodologies, the rule does establish upper limits for reimbursement, and these upper limits affect the compensation that providers receive. Further, the rule may affect a provider's decision whether to participate in Medicaid and, thus, the accessibility of Medicaid services. This implicates important statutory objectives. Finally, if, as plaintiff alleges, HCFA failed to explain its decision to promulgate the proposed rule, this action by the agency affected important interests of NACDS and its members in participating in a program regulated by fair and reasonable regulations. For these reasons, the Court finds that plaintiff has standing in this case, and defendants' motion to dismiss should be denied.

*Bowen*, at *4.

The Court agrees with the reasoning of the *Bowen* court. The Hospital Plaintiffs and the members of the Association Plaintiffs are safety net hospitals that participate in the Medicaid program and qualify for supplemental funds pursuant to the 2001 Rule. The 2002 UPL Rule will automatically reduce the compensation available to such hospitals once it goes into effect. As Plaintiffs emphasize, the States *could* take steps to ameliorate the effects of the 2002 UPL Rule, but absent such action, the Rule will decrease the funding available to Medicaid providers. Thus, the 2002 UPL Rule has a direct impact on Plaintiffs, without any intervening acts required.

26. The Plaintiffs originally suggested that this judicial review should involve the "substantial evidence" standard. *See* 5 U.S.C. § 706(2)(E). But as Defendant points out, that standard applies only to agency adjudications and adjudicatory rule-making controlled by the formal procedures of 5 U.S.C. §§ 556–557 and not to informal rule-making at issue here.

*Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983). Indeed, "an agency changing its course by rescinding a rule is obligated to supply a reasoned analysis for the change beyond that which may be required when an agency does not act in the first instance." *Id.* at 42, 103 S.Ct. 2856. However, Congress has conferred on the Secretary exceptionally broad authority to prescribe standards under the Medicaid statute. *See Schweiker v. Gray Panthers,* 453 U.S. 34, 43, 101 S.Ct. 2633, 69 L.Ed.2d 460 (1981). The breadth of his discretion must be recognized by courts including in situations where an agency has changed its position from one taken by an earlier administration. *See Barnhart v. Walton,* — U.S. —, 122 S.Ct. 1265, 1274, 152 L.Ed.2d 330 (2002) (Scalia, J., concurring).

 The Supreme Court has advised that "the scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency." *Motor Vehicle,* 463 U.S. at 43, 103 S.Ct. 2856. However, before an agency finalizes a rule it "must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Id.* (quoting *Burlington Truck Lines, Inc. v. United States,* 371 U.S. 156, 168, 83 S.Ct. 239, 9 L.Ed.2d 207 (1962)). Indeed, the Supreme Court has indicated that an agency rule is normally arbitrary and capricious under the following circumstances:

(1) the agency relied on factors which Congress has not intended it to consider;

(2) the agency entirely failed to consider an important aspect of the problem;

(3) the agency offered an explanation for its decision that runs counter to the evidence before the agency; or

(4) the agency offered an explanation for its decision that is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Id.*[27]

### B. The Statement of Basis and Purpose

 All final agency rules must contain "a concise general statement of their basis and purpose" pursuant to 5 U.S.C. § 553(c). The basis and purpose statement must identify "what major issues of policy were ventilated by the informal proceedings and why the agency reacted to them as it did." *St. James Hospital v. Heckler,* 760 F.2d 1460, 1469 (7th Cir.1985) (citing *Automotive Parts & Accessories Ass'n v. Boyd,* 407 F.2d 330, 338 (D.C.Cir. 1968)); *see also Boswell Memorial Hospital v. Heckler,* 749 F.2d 788, 794 (D.C.Cir. 1984). It need not, however, respond to every fact or contention in the comments submitted. *Id.*

The Plaintiffs contend that the basis and purpose statement contained in the 2002 UPL Rule is legally insufficient because it (1) does not address the substantive, quantitative assessments of likely harm to hospitals submitted by numerous commentators; and (2) does not explain how those assessments of harm affected the new regulation. The Plaintiffs also contend that the basis and purpose statement is deficient due to the Secretary's "willful mischaracterization of the comment letters." Specifically, Plaintiffs emphasize that the statement of basis and purpose employs

---

27. A reviewing court "may not supply a reasoned basis for the agency's action that the agency itself has not given." *Motor Vehicle,* 463 U.S. at 43, 103 S.Ct. 2856. The court shall, however, "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Id.*

the identical term—"several"—to describe the numbers of comment letters in support and opposed to the 2002 UPL Rule. *See* 67 Fed.Reg. 2602, 2604 (January 18, 2002). In actuality, only two of the approximately 240 Comments in response to the 2002 UPL Rule expressed support for the Rule; the remainder were opposed to it. *See* Administrative Record for 2002 Rule, Volume II.[28]

### 1. *The Comments in Response to the Proposed 100 Percent Rule*

Before determining if the Secretary adequately addressed the Comments submitted, it is important to review these Comments in some detail. It also is important to analyze these comments because the agency's analysis thereof is the central focus of the Plaintiffs' argument concerning the Rule's basis and purpose statement. Thus, the Court has reviewed all of the Comments offered in response to the 2002 UPL Rule. The commenters include persons working in a variety of positions related to patient care, including physicians and hospital administrators, as well as union representatives and elected officials from the county, state and federal levels. As noted, all but two of the Comments were strongly opposed to the change from the 150 percent UPL to the 100 percent UPL. In general, the commentators labeled the 100 percent rule as a direct assault on the ability of hospitals to provide essential health care to the uninsured and underinsured,[29] and commenters also predicted that safety net hospitals in

28. The Court notes that fourteen Comments in response to the 2002 UPL rule were not included in the administrative record and, thus, were not reviewed by HHS prior to promulgation of the final rule. These comments have been provided to the Court. It is questionable whether three of those letters were timely received. *See* Declaration of Michelle R. Shortt. However, it appears that the remainder of these Comments were timely received but were not included with the other Comments reviewed by HHS because they were "inadvertently intermingled with other regulatory documents." *See* Declaration of Timothy C. Miller.

The Court has reviewed all of these Comments and finds that they repeat many of the same concerns expressed in the many Comments included in the administrative record. This does not suggest that the Court considers the excluded Comments to be wholly insignificant. Indeed, the Court notes that two States (Iowa and Colorado) that were not represented in the Comments included in the record were represented in the timely-filed excluded Comments. In addition, the timely-filed excluded Comments included a particularly informative letter from Susan Maddox, President and CEO of California Children's Hospital Association (CCHA). CCHA is comprised of eight private, non-for-profit pediatric hospitals in California. This letter predicted that the 2002 UPL Rule, in combination with other financial stresses in the California, "could result in a collapse of the State's pediatric

medical infrastructure." *See* Letter of Susan Maddox, attached to Declaration of Timothy C. Miller, at 4. This letter reaffirms the suggestion of many commenters, as well as Plaintiffs' counsel, that California has been using supplemental payments and IGTs to promote many health care initiatives for its indigent populations. Lastly, the timely-filed excluded Comments also included a letter from Peters D. Willson, Vice President of Public Policy for the National Association of Children's Hospitals. This letter stated that the nation's children's hospitals devote, on average, nearly half of their care to children assisted by Medicaid and more than 75% of their care to children with chronic or congenital conditions. *See* letter of Peters D. Willson, attached to Declaration of Timothy C. Miller, at 1. This letter urged HHS to delay any changes in the 150 percent rule until it had first fully assessed the impact of the rule on safety net hospitals and, most especially, children's hospitals.

The absence of these Comments from the administrative record was an unfortunate oversight. However, the Court is convinced that (1) the exclusion of these Comments was unintentional, and (2) the excluded Comments generally raised the same issues that were raised and responded to by the Secretary in the final rule.

29. Of course, the term "uninsured" refers to persons who are not Medicaid or Medicare beneficiaries and have no form of private pay-

several states would have to cut services or close altogether as a result of the rule.

Several commenters included predictions as to the specific amount of financial losses that particular states and/or counties will incur once the 2002 UPL Rule becomes effective. For instance, certain commentators stated that the 2002 Rule would result in the following losses: (1) an estimated $1 billion dollar loss to California over that state's eight-year transition period and an estimated $300 million annual loss to California once the 2002 Rule is fully implemented; (2) a loss of $14–15 million per budget year to county health services in Alameda County, California; (3) a loss of $28 million to Santa Clara Valley Medical Center, located in Santa Clara, California; (4) an estimated $8 million annual loss to Hennepin County Medical Center, Minnesota's largest safety-net hospital; (5) an estimated $48 million annual loss to the University of California academic medical centers; (6) an estimated $125 million annual loss to the Los Angeles County Public Health System; (7) an estimated $25–30 million loss to California children's hospitals; (8) an estimated loss $400 million loss to New York hospitals; (9) an estimated $200 million loss to Florida hospitals, including a $34 million loss to Jackson Memorial Hospital, the designated trauma/burn center in cases of state or federal emergencies for South Florida; (10) an estimated $10 million annual loss to San Francisco General Hospital Medical Center, the only designated trauma center for the City and County of San Francisco; (11) an estimated $12 million annual loss to Oregon Health & Sciences University Hospitals & Clinics; and (12) an estimated $59 million loss to the University of Medicine and Dentistry of New Jersey teaching hospital.[30]

ment source. The Court notes that the uninsured and underinsured are often not eligible for Medicaid benefits and that the maximum income that a person can make and still be eligible for Medicaid varies by state.

**30.** As can be discerned from the Court's summary of the Comments, California's health care industry was well-represented among commentators. It appears that California has maximized its ability to fund health services for the indigent through UPL payments. Indeed, many California physicians, hospital administrators, and elected officials emphasized that California's health care system had already taken special measures to cut costs and streamline services to Medicaid beneficiaries and, thus, UPL payments were used only to strengthen the most critical and endangered aspects of health care in the state. The Court notes the following excerpts from California commentators:

The [2002 UPL] regulation unduly interferes with a long-running, federally approved waiver program—the Selective Provider Contracting Program—that has saved federal dollars.

The Selective Provider Contracting Program (SPCP) Waiver was first approved in 1982 as a solution to the escalating cost of health care and the increasing need for access to health care for Medicaid recipients. Since then, it has been an important source of savings for California and the Federal government.

Currently, most public hospitals are paid through the Selective Provider Contracting Program. Contracts under the Selective Provider Contracting Program Waiver are with hospitals that most often: (1) serve a disproportionate share of Medicare recipients; (2) provide access to speciality services, i.e., Organ Transplants, Neonatal Intensive Care Units, Burn Care Units; and/or (3) provide emergency services.

The SPCP Waiver allows California to negotiate rates for inpatient services in a competitive market. The hospitals that are awarded SPCP contracts provide care to the majority of Medicaid beneficiaries in the fee-for-service population. As a result of the competitive nature of the SPCP Waiver, hospitals have been motivated to economize by closing or reducing services that were not fully utilized or were outdated, thereby saving the state and federal government money. In addition, hospitals have consolidated under centralized management in order to save administrative costs. Expensive speciality services have also been consolidated by location, rather than pro-

Several commentators emphasized that their states did not shift supplemental payments to areas unrelated to the care of Medicaid beneficiaries and indigent patients but, rather, used supplemental payments to make up for Medicaid shortfalls and uncompensated care. These commentators further emphasized that IGTs play an irreplaceable role in this process due to shortfalls in state general funds and the large number of uninsured residents.

vided in all hospitals in the same location. As a result, hospitals have become centers of excellence in their speciality, improving the quality of care.

Hospitals have already cut costs wherever possible in order to stay competitive. Over the ten-year period from 1990–1999, the number of licensed general acute care beds in California has decreased by 9,706 beds or 12 percent, at a time when the state's population has increased. Over the same period of time, the number of discharges has increased. The decrease in licensed beds is a result of hospital closures and/or the closure of hospital wards. Hospitals have continued to cut their costs wherever possible in order to maintain their share of the Medicaid market under the SPCP.

The SPCP Waiver has saved federal money by the creation of a competitive market in the inpatient setting. While it may be necessary to pay some public hospitals more than 100 percent to maintain critical services like trauma care, the waiver's overall cost neutrality requirement ensures cost effective use of federal funds. Under the narrower UPL categories, this is no longer possible. For this reason, California requires flexibility which the categories in these regulations do not permit. To keep this successful program going, an exemption for the SPCP to the proposed changes to the UPL would therefore be appropriate. Comment 33, letter of Grantland Johnson, California Secretary of State.

In California, our Selective Provider Contracting Program allows for contract payments to include additional payment components targeted to certain hospitals that serve disproportionate numbers of Medi-Cal and low income uninsured patients and to teaching hospitals. Both public and private hospitals are eligible to receive these additional payments. The amount of these

These commentators suggested that HHS, in a rush to correct abuses in only some State programs, overlooked the crucial role that IGTs play in states that properly use supplemental payments to maintain hospital operations in certain impoverished areas.[31] The Court notes the following excerpts from various comments:

Montana's current fiscal constraints do not allow the State to provide the neces-

supplemental payments is determined through confidential negotiations between each hospital and the California Medical Assistance Commission, an independent state agency. The three major supplemental components are: 1) supplemental payments for disproportionate share hospitals that provide basic or comprehensive emergency services; 2) payments to hospitals with medical education programs; and 3) payments under the Construction/Renovation Reimbursement Program, for assisting disproportionate share hospitals with expenses incurred for capital projects. The supplemental payment components were first used more than a decade ago to prevent the collapse of California's trauma systems and to address a mounting obstetrics crisis for Medi–Cal beneficiaries. These funds continue to support access to emergency room and trauma care services for Medi–Cal and low-income uninsured patients, pediatric care in all children's hospitals, as well as costly, highly specialized services, such as burn care. . . .

Comment 43, letter of C. Duane Dauner, President of California Healthcare Association.

For a better understanding of the California situation, the Court recommends the explanation given by Ms. Barbara Eyman during the oral argument. Ms. Eyman states that she is a non-litigator specialist in Medicaid and Medicare programs. *See* Transcript of Hearing, dated April 10, 2002, at 27–33.

**31.** One commentator described the 2002 Rule as "an 'over-correction' that disturbs the delicate balance of interests achieved last year [in the 2001 UPL Rule], and inequitably punishes needy families residing in states that have not been abusing the system." Comment 19, letter of Michael D. Nevin, President of the San Mateo County Board of Supervisors.

sary matching funds to obtain available federal Medicaid funding. Hospitals and nursing homes have come forward with local government funding necessary to improve Medicaid payments.

Montana has not engineered its programs to drain federal Medicaid funding for non-Medicaid purposes. Our programs have comported to both the letter of the law and the spirit of the law.[32]

*See* Comment 12, letter of Robert Olsen, Vice President of Montana Health Association.

Under Mississippi's UPL Program, all of the UPL funds are distributed to Mississippi hospitals. The 150% UPL Rate provides over $24 million to 21 non-state government owned or operated hospitals.... Mississippi has not abused the Upper Payment Limit regulations, but has implemented its UPL program in accordance with the original intent of the regulation.

*See* Comment 18, letter of Sam W. Cameron, President and CEO of Mississippi Hospital Association.

For over 12 years, [California] has consistently directed its supplemental Medicaid payments to safety net hospitals that care for the greatest number of low-income, uninsured, medically needy patients. In fact, California has adopted the most stringent standard of funding eligibility in the entire nation, requiring hospitals have a patient population of more than 25 percent low-income or uninsured to receive funds.

*See* Comment 19, Michael D. Nevin, President of the San Mateo County Board of Supervisors.

It is important to recognize the distinction between California's supplemental contract payments and the so-called "UPL programs" that have been regarded as abusive. California's payments are not made for the sake of incurring the maximum amount of Medicaid expenditures in order to draw federal funding. The Medi–Cal contract payments are made on the basis of various criteria that reflect a particular hospital's degree of access to essential services for Medicaid beneficiaries. Thus, California's payments, by design, are directed at increasing the quality and availability of services provided to the Medicaid population.

. . . . .

Although California utilizes the intergovernmental transfer mechanism for funding the non-fed share of certain Medi–Cal payments, the State's mechanisms do not divert funds away from hospitals. Through the competitive negotiation process, all of the targeted supplemental payments, including the federal matching fund, are distributed to those hospitals, both public and private, that provided access to care for Medi–Care beneficiaries.

*See* Comment 43, letter of C. Duan Dauner, President of California Healthcare Association.

The citizens of Miami–Dade County raise over $200 million in local tax revenue that is used to provide healthcare services to the County's uninsured. Most of that care is provided by Jackson Memorial Hospital. The 150% UPL

32. This Comment does not specify to what ends supplemental payments have been put in Montana. However, the Comment did state that "[i]n its IGT program for nursing home payments, Montana Medicaid required the nursing homes to return a portion of its additional payments to the State to finance cost overruns in other portions of the Medicaid budget. Montana's financing mechanism helped the State avoid making reductions to the Medicaid mental health and pharmacy programs." *See* Comment 12, letter of Robert Olsen, Vice President of Montana Health Association.

gives Jackson Memorial Hospital the flexibility to use this legitimate local, health care tax revenue as an intergovernmental transfer under the Medicaid program. In turn, the Medicaid plan allows for enhanced payments to Jackson Memorial and pays 69 other hospitals their costs for inpatient Medicaid services. Thus, reducing the UPL to 100% would harm not only Jackson Memorial but 69 other hospitals because the state would be forced to reduce reimbursement across all providers—public and private—due to the lack of available state match.

*See* Comment 46, letter of John Hillenmeyer, Interim Chair Florida Statutory Teaching Hospital Council.

In Montana, the matched funds are issued directly to the participating hospital. The funds have been used to retain registered nurses, which is an issue nationwide and a heightened issue in rural Montana. In another situation, the funds were used by a hospital to allow it to issue payroll to its employees. Another hospital reported being able to purchase a much-needed piece of equipment. Yet another was able to pay an equitable wage to retain nurse aides. None of these funds were siphoned off for the state general fund: no highways were built, no bridges were built and no potholes were filled using matched funds. These funds went directly to smaller, rural hospitals that desperately needed them and used them for healthcare.

Comment 58, letter of Judy Martz, Governor of Montana.

In addition, some commentators emphasized that supplemental payments were crucial to hospitals within their particular state given high poverty levels and low Medicaid reimbursement rates, which, as noted previously, are established by each individual State. For instance, the CEO of Kentucky River Medical Center included the following statements within his comment:

Kentucky Hospital inpatient reimbursement covers only 78 percent of the Medicaid allowable costs, making Kentucky the 38th lowest Medicaid payer in the nation. The supplemental UPL payments will help to shore up this inadequacy but still not bring Kentucky hospital reimbursement of costs up to the national average.

Kentucy hospitals receive less federal Medicaid DSH funding per person in poverty than other states despite having a larger percent of poor people. Supplemental payments are needed to help hospitals protect access to services for poor people.

*See* Comment 10, letter from O. David Bevins, CEO of Kentucky River Medical Center.

Commentators also argued that the impact of the 2002 Rule would be heightened by poor economic times across the nation, which have prompted dramatic state budget cuts and an increase in the numbers of unemployed and uninsured persons. For example, one commentator noted that Florida has had to cut more than $1.3 billion from its budget.[33] Another noted that the Medicaid roles in South Carolina increased by almost fifteen percent in fiscal year 2001 while South Carolina's unemployment rate rose above the national average.[34] The Commissioner of the Georgia Department of Health noted that "Georgia is experiencing an economic downturn, employers are downsizing their workforces,

---

**33.** Comment 11, letter of Erwin P. Bobo, Chief Operating Officer of the Florida Association of Homes for the Aging.

**34.** Comment 16, letter of William Prince, Director of Health and Human Services for the State of South Carolina.

Medicaid is experiencing a substantial deficit, [and] health costs in general and pharmaceutical expenditures in particular continue to rise—timing could not be worse to shut down the UPL funding stream." [35] An AFL–CIO representative commented that, as of December 2001, "nearly one million" individuals have lost their health insurance since March of 2001.[36] And one Arkansas commentator noted that the 2002 UPL Rule "comes at a time when hospital budgets in Arkansas continue to be stressed by inadequate Medicare and Medicaid payments; when state budget shortfalls have recently caused a $50 million reduction in Medicaid spending for this year; and when our hospitals are coping with soaring costs and demands, in addition to the commitment and resources required to upgrade disaster readiness." [37]

Commentators also made the following arguments: (1) the new reporting requirements that were part of the 2001 regulation would give CMS greater ability to efficiently determine if any states are shifting supplemental payments to non-Medicaid uses and, if so, to correct such practices and sanction the particular state or states; (2) CMS should wait to alter the 150 percent rule until it has analyzed the data submitted pursuant to the new reporting requirements and has determined that states are manipulating the 150 percent rule in order to shift supplemental payments to non-Medicaid related uses; and (3) the 100 percent rule will be particularly detrimental to states in which

legislatures relied on projected payments pursuant to the 150 percent rule when establishing budgets for the upcoming fiscal year. Finally, many commentators argued that the transition periods provided in the 2002 Rule were inequitable because they did not grant transition periods to States that only recently implemented UPL supplemental payment programs.

### 2. *HHS' Analysis of the Comments*

The Defendant provided Table B of Defendant's Summary of the Comments Received which he contends shows that 104 of the comments were virtually identical postcards and 33 were "form letters." He states that less than 70 comments were "genuinely different comments" and most of these were "so similar in structure and sentiment as to be suggestive of a letter-writing campaign." Having examined the record, the Court finds itself in general agreement with his assessment. The Defendant uses this to reinforce his view that the agency is not required to respond to each Comment but only to the significant issues raised overall. *See* discussion below.

The Defendant devoted roughly four pages of discussion to the Comments in response to the 2002 UPL Rule. *See* 67 Fed.Reg. 2602, 2604–08. The Defendant did not address any of the specific amounts of financial harm predicted to befall particular hospitals or States. However, the Defendant noted, in general, that "several commenters" predicted severe financial

---

**35.** Comment 22, letter of Gary Redding, Commissioner of the Georgia Department of Health.

**36.** Comment 26, letter of Christine Owens, Director of the AFL–CIO.

**37.** Comment 67, letter of Paul Cunningham, Senior Vice President for Arkansas Hospital Association. Several commentators noted that state budgetary concerns have been heightened as a result of the terrorist attacks

on September 11, 2001, and the increase in public spending that has resulted from those attacks. One commentator stated that costs of police and public health services in California "are estimated to have increased between $400,000 and $1 million per day as a result of the need to increase public safety" and that "state or federal funding has yet to be enhanced to pay for these services." *See* Comment 33, letter of Grantland Johnson, California Secretary of State.

consequences to many hospitals as a result of the Rule. In particular, the Court notes the following excerpt from the Defendant's promulgation of the final Rule:

> *Comment:* Several commenters expressed concern about the effect of this rule on the health care safety net in specific States. They indicated that a reduction in funds resulting from this final rule would cause hospitals to cut services or close altogether. Further, commenters indicated this rule would cut access to critically needed health services for the uninsured, including immigrants and working families. One commenter pointed out that the reduction in reimbursement rates would produce a crisis in health care in one State, which would result in many more serious illnesses and deaths across the State. Another commenter expressed particular concern with the impact of the rule on children's hospitals.
>
> *Response:* This rule would permit States to reimburse hospitals for 100 percent of their reasonable costs of pro-

viding care to Medicaid patients, based on a reasonable estimate of what Medicare would have paid for services provided to Medicaid patients. Although we previously believed a higher UPL was necessary to ensure the availability of safety net facilities, we have concluded that a 100 percent UPL will achieve that purpose because it is adequate to pay hospitals their reasonable costs of serving Medicaid patients. States also have the ability to pay additional Medicaid payments to safety-net hospitals and receive Federal funding under the Medicaid disproportionate share hospital program. The statutory authority for such payments permits States to recognize those hospitals that treat a high number of Medicaid and low-income patients by increasing Medicaid payments to those hospitals that qualify.

67 Fed.Reg. 2602, 2604. The statements included in the Response noted above were frequently repeated—either verbatim or with slight alterations—throughout the Defendant's Responses to the Comments.[38]

---

**38.** In response to Comments pertaining to economic concerns stemming from the terrorist attacks of September 11, 2001, the Defendant responded, in part, that "[u]nder this rule, States will retain the flexibility to pay these facilities up to 100 percent of a reasonable estimate of what Medicare would have paid for services provided to Medicaid beneficiaries." 67 Fed.Reg. 2605. In response to Comments pertaining to current economic instability across the nation, the Defendant responded, in part, that "[t]his rule allows States to pay hospitals up to 100 percent of the reasonable costs of serving Medicaid patients, based on a reasonable estimate of what Medicare would have paid for the services provided to medicaid patients." *Id.* •

*See also* 67 Fed.Reg. 2604 ("[T]he Medicare, Medicaid, and SCHIP Benefits Improvement and Protection Act of 2000 (BIPA), enacted on December 21, 2000, provides additional funding to public hospitals by increasing the hospital-specific disproportionate share hospital limits originally set under the Omnibus Budget Reconciliation Act

of 1993. States will have the ability to make Medicaid Disproportionate share hospital payments to public hospitals up to 175 percent of a hospital's reasonable costs of treating the uninsured and Medicaid beneficiaries for a period of two State fiscal years beginning after September 30, 2002, and receive Federal matching funds for these higher DSH payments."); 67 Fed.Reg. 2605 ("Under this rule, States will be able to receive Federal funding for hospital expenditures incurred on behalf of Medicaid-eligibles as permitted under Federal law. While the rule will limit States' ability to receive Federal funding for excessive payments, we believe States will retain flexibility to set fair and appropriate payment rates to public hospitals."); 67 Fed. Reg. 2608 ("The Medicaid statute has specific provisions for the additional payments to assist disproportionate share hospitals but does not contemplate other general assistance to hospitals, or use of excessive payments as mechanisms to finance general State obligations.").

The Defendant also emphasized that the transition periods would allow States "that have had longstanding reliance" on supplemental payment programs adequate time "to find other funding sources to replace the money generated by the UPL payment mechanisms." 67 Fed.Reg. 2606.[39] In sum, the Defendant recognized that States with supplemental UPL plans could lose money under the 2002 UPL Rule, but the Defendant also emphasized that the Rule was necessary to prevent States from using Federal funding "to substitute for State funding." 67 Fed.Reg. 2607.

### 3. *Analysis of Basis and Purpose Argument*

■ Defendant emphasizes that the requirement of a basis and purpose statement does not mandate a detailed response to each individual comment in the record but, rather, it calls for only a reasonable response to comments raising significant issues. *See Reytblatt v. United States NRC,* 105 F.3d 715, 722 (D.C.Cir. 1997) ("An agency need not address every comment, but it must respond in a reasoned manner to those that raise significant problems."). Indeed, Defendant describes the Plaintiffs' attack of the 2002 Rule's basis and purpose statement as "merely a lengthy exercise in make-weight." Defendant's Brief of March 27, 2002, at 42.

The Court does not agree with Defendant's "make-weight" assessment, especially in light of the possible severe consequences of this Rule in certain States. Clearly the Defendant could have done a better job in responding to the Comments, but that is not the test. In evaluating the agency's responses the Court must keep in mind the subject of the regulation and the nature of the Comments received. The Defendant responded in a reasoned manner to the significant Comments. On balance, the Court finds and concludes that (1) the Secretary satisfied the basis and purpose requirement of the APA, (2) identified and explained the concerns precipitating the Rule, and (3) adequately responded to significant issues raised by the commenters as a whole.

What the Court found more troubling early on was whether the contentions made in the Secretary's responses—and elsewhere throughout the promulgation of the final rule—are adequately supported by the rule-making record. Because this issue is the central focus of the Plaintiffs' contention that the Rule is arbitrary and capricious, the Court will now turn its attention to that issue.

### C. THE ARBITRARY AND CAPRICIOUS ARGUMENT

Plaintiffs' main argument, and the one that has been the most difficult for this Court to resolve, is their contention that the 2002 UPL Rule is arbitrary, capricious and an abuse of the Secretary's discretion. Initially, the Plaintiffs emphasize that the Secretary has given minimal attention to the actual harm that will occur once the Rule becomes effective. Plaintiffs paint a bleak picture of the Rule's consequences. In particular, Plaintiffs contend that many

---

**39.** The Defendant noted in its responses to the Comments that States which had established supplemental payment programs subsequent to the 2001 UPL Rule would not be eligible for transition periods—even though some of these States likely had factored payments pursuant to the 2001 Rule into their budgets. However, the Defendant rejected pleas from health care representatives of these States to implement a transition period for these States. The Defendant reasoned that "the 150 percent UPL has only been in place since March 2001, and, therefore, States have not developed the same reasonable reliance on that higher UPL as they have on payments that were in place for several years." 67 Fed.Reg. 2606.

locally-owned public hospitals will be required to cut essential services to their underserved patient populations and that these cuts might include the elimination of entire departments and the closure of community-based clinics. The predicted harm is not limited to locally-owned hospitals. Indeed, Plaintiffs contend that the 2002 UPL rule will seriously disrupt the delicate balance of safety net financing in many States.

### 1. *Plaintiffs' Contentions Regarding Arbitrariness*

Plaintiffs point to several factors that, in their view, reveal that the 2002 UPL rule was a hasty over-response to a problem that was addressed in the 2001 UPL rule.[40] In particular, Plaintiffs contend that the 2002 UPL Rule is deficient for the following reasons:

**40.** The Plaintiffs also have argued that the Defendant's characterization of the 2002 Rule as an effort to prevent abusive IGTs is a post hoc rationalization. The Court, however, does not agree. Indeed, the notice of the final rule states the Secretary's concern that supplemental payments are not being used in support of safety net hospital but are being "transferred directly back to the State via intergovernmental transfers and used for other purposes." 67 Fed. Red. 2603. The summary of the final rule also states that it "is part of this Administration's efforts to restore fiscal integrity to the Medicaid program and reduce the opportunity for abusive funding practices based on payments unrelated to actual covered Medicaid services." *Id.* The administrative record is replete with references to potential and actual abuse under the UPLs, and the notices of the proposed and final rule clearly indicate the Secretary's concern pertaining to abusive financing mechanisms.

The Plaintiffs also have characterized the 2002 Rule as an attempt to restrict IGTs in violation of 42 U.S.C. § 1396b(w)(6)(A) ("[T]he Secretary may not restrict States' use of funds where such funds are derived from State or local taxes ... transferred from or certified by units of government ..."). Again, the Court does not agree. The 100

(1) The Secretary relied on inaccurate and irrelevant data, namely, the OIG final report of September 11, 2001. In particular, Plaintiffs emphasize that the OIG report does not analyze States' use of supplemental payments pursuant to the 150 percent rule. Instead, the OIG report was based solely on audits conducted prior to the enactment of 2001 UPL Rule, and, thus, provides no evidence that States are abusing the 150 percent rule.[41] In addition, Plaintiffs emphasize that the OIG report was based on only seven audits in six states, and only three of the audits involved payments to hospitals. Thus, Plaintiffs contend that the OIG's conclusions cannot properly be generalized to all states. (2) The Secretary ignored relevant evidence that was counter to his predetermined policy choice. More specifically, Plaintiffs emphasize that Defendant did

percent rule does not prohibit IGTs. Rather, it only reduces the amount of federal matching funds that States can obtain through the misuse of IGTs.

**41.** As noted previously, the rule-making record for the 2001 UPL Rule contains draft reports outlining preliminary findings of six of the seven audits that were the subject of the OIG's final report on September 11, 2001. The only audit that was not mentioned in the rule-making record for the 2001 Rule was the review of North Carolina's enhanced payments to hospitals. The report detailing this audit is included in the administrative record for the 2002 Rule at 50–64. Interestingly, the OIG concluded that Medicaid supplemental payments to public and private hospitals in North Carolina were based on their Medicaid deficits. In addition, the OIG found that hospitals in North Carolina retained all of the supplemental payments and used them to pay facility expenses. However, the OIG report also stated that public hospitals returned 90 percent of their DSH payments to North Carolina through IGTs, raising the question as to whether the supplemental payments would have been needed if all of the DSH payments had been retained by the hospitals. *See* Rule-making Record for 2002 Rule, at 54–55.

not (a) analyze the supplemental payment programs in the states that had obtained approval of State Plan Amendments pursuant to the 150 percent rule.[42] The Plaintiffs also emphasize that the Secretary did not seek to implement the reporting requirements included in the 2001 Rule until shortly before the NPRM was published on November 23, 2001. Thus, Plaintiffs contend that Defendant was without data that should have played a vital role in any analysis of the 150 percent rule.

(3) The Secretary failed to consider the likely harm to safety net hospitals and their patients. In particular, the Plaintiffs emphasize that the Secretary points to no evidence to support his conclusion that the 100 percent rule will be sufficient to pay the full reasonable costs of hospitals serving the Medicaid populations.

(4) The Secretary failed to articulate a rational connection between his decision and claimed mitigating factors. In particular, the Plaintiffs contend that the Secretary arbitrarily concluded that the

transition periods included in the Rule and DSH payments would mitigate the reduced funding under the 2002 UPL rule. The Plaintiffs emphasize that the transition periods included in the 2002 Rule impose much more drastic payment reductions than those that were required under the 2001 Rule, and, yet, the Defendant did not specifically discuss the extreme nature of this discrepancy in promulgating the Rule. Plaintiffs also note that the predictions of harm included in the Comments were based on budget shortfalls even with DSH payments. In addition, Plaintiffs emphasize that some of the hospitals that will be affected by the Rule, such as Ashley County Hospital, do not even qualify for DSH payments because they do not have two obstetricians on staff. *See* 42 U.S.C. § 1396r–4(f).[43]

### 2. *Defendant's Response*

In response, the Defendant asserts that the Plaintiffs ignore the history of State abuses of the Medicaid program through manipulative funding transfers. Defen-

---

**42.** Plaintiffs note that the Defendant, in responding to some of the Comments, stated that the 2002 UPL Rule was based on "a review of the OIG reports . . . as well as our own review of the new State plan amendments submitted after the January 2001 rule took effect." 67 Fed Reg. 2608. Yet, the Plaintiffs contend that the rule-making record is completely void of any analysis of said State plan amendments. The Court agrees that the record does not contain any formal analysis of State plan amendments filed subsequent to the 2001 Rule. However, it does contain copies of said state plan amendments. Moreover, the Defendant has pointed to several excerpts from the state plan amendments referring to the use of IGTs. Many of these references suggest that the some States do intend to require local hospitals to return a portion of supplemental payments to State coffers. *See* Rule–Making Record for 2002 Rule, at 785, 788, 793, 801, 816, 818, 825, 1234, 1307.

**43.** The Plaintiffs also argue that the Defendant ignored signals from Congress that indicate congressional support for the 2001 UPL Rule. Plaintiffs rely on language in an annual appropriations committee report to the effect that the Secretary should not amend the 2001 UPL Rule until "after the administration has had an opportunity to assess the implementation of the new regulations and only in consultation with the States and their Medicaid programs, as well as the other stakeholders." S.Rep. No. 107–84 at page 215 (2001); H.R. Conf. Rep. 107–342, 103 (2001), U.S.Code Cong. & Admin.News 2001, 1690, 1734–1735. However, as the parties appear to agree, such precatory language in an appropriations report has no legal effect. It is the Medicaid statute, not a committee report, which is the law the Defendant must follow. *See Chicago v. Environmental Defense Fund,* 511 U.S. 328, 337, 114 S.Ct. 1588, 128 L.Ed.2d 302 (1994); *Northern State. Power Co. v. U.S.,* 73 F.3d 764, 768 (8th Cir.1996).

dant contends that "experience with the UPL concept has taught that a UPL greater than 100 percent has potential to invite multimillion dollar abuses and cause substantial overpayments to the states, most often to subsidize indirectly non-Medicaid state programs." Defendant's Brief of March 27, 2002, at 1. Specifically, the Secretary contends that he decided to promulgate the 100 percent rule for locally-owned hospitals for the following three reasons:

(1) the 150 percent rule left too much potential for abusive financial arrangements in the form of IGTs that artificially inflate the states' apparent financial contribution to the Medicaid program as a means of garnering additional federal matching funds;

(2) he determined that a limit set at 100 percent of Medicare payment principles was "more than sufficient" to ensure "adequate" access by Medicaid beneficiaries to efficiently-operated county and municipal hospitals; and

(3) he found that it was appropriate to restore the "payment equity" that had previously existed among the hospitals that treat Medicaid patients.

*Id.* at 2–3. The Secretary emphasizes (1) the conclusions of the OIG's final report and (2) "the fact that the majority of states newly requesting the Secretary's approval of state plan amendments with a 150 percent UPL for non-state public hospitals used these intergovernmental transfers as part of their plan." *Id.* at 3. In sum, the Secretary contends that the 2002 UPL Rule was a rational decision, in light of the OIG's final report and the Secretary's own review of state plan amendments proposed after the 2001 UPL Rule, that the 150

percent rule did not go far enough to curb abusive IGTs.

### 3. *Court's Summary, Analysis and Rulings*

Having reviewed the arguments of the parties, the Court now concludes that the Secretary was not acting arbitrarily or capriciously when he promulgated the 2002 UPL rule.

### (a) Conclusion that the 100 Percent Rule was Needed to Stop Potential for Abuse

■ The Plaintiffs note that the rule being changed—the 2001 UPL Rule—had only been in effect some eight months when the Secretary proposed the change. They emphasize the agency's lack of any meaningful experience under the new 2002 Rule and the circumstances that so much of the support for the new rule was the same as that used by the prior Secretary to support the old 2001 Rule. The Court suggests that such arguments miss the real point: The problem addressed by both rules has a long, long, history as detailed above.[44] We are not dealing with circumstances arising after the promulgation of the 2001 rule which warranted a change. Rather, the current Secretary is taking the position that the 2001 rule simply did not adequately deal with an old, obvious, and acknowledged problem. Indeed, the previous Secretary, when he promulgated the 2001 150 percent UPL Rule, recognized that State and local governments might continue to require these local public hospitals "to transfer back a portion of payments that they receive under Medicaid" and that "this practice raises serious concerns about whether the pur-

---

**44.** Since the Medicaid program was created in 1965 the federal government has tried to develop a workable payment system to finance medical and health care services for the poor. As detailed above, it has had to repeatedly close loopholes in that system, loopholes which resulted in diverting literally billions of dollars away from the purpose of providing health care for the indigent.

poses of the higher payment limits being proposed for public hospitals will be met." *See supra.* And, in announcing the 2001 Rule, HHS stated that "should we find that payments made under the higher limits are not being retained to support Medicaid services, we would be open to making further revisions in subsequent rulemaking." 66 Fed.Reg. 3154.

The new Secretary determined that the 2001 150 percent UPL Rule left far too much potential for the very type of abusive financial arrangements in the form of IGTs that had plagued the system in the past. He, of course, had before him the CMS letter of July 26, 2000, and the OIG and GAO reports, which have been quoted from at length above. These fully and rationally support the Secretary's concern that the 2001 150 percent UPL rule left the same *potential for abuse* that had existed before. There were also available a significant number of Comments that were made in response to the 2001 Rule when it was proposed. Some indicated that the 150 percent Rule was not needed and "that the limit should remain 100 percent for all groups" of hospitals. 65 Fed.Reg. 3148, 3154 (Jan. 12, 2001). Some commentators contended that the Secretary had not cited any empirical evidence that 100 percent of Medicare payment principles would not be sufficient to assure adequate access to non-state public hospitals for Medicaid beneficiaries. In the preamble to the 2001 Rule the Secretary noted the difficulty in obtaining empirical data to justify the higher (150 percent) UPL:

> We were aware in publishing the proposed rule that proper payment data were difficult to obtain and that those who could provide such data were reluctant to do so because it would disclose the transfer of the excessive payment amounts received by providers back to the State.

As a result, the Secretary conceded that "it was not absolutely clear what level of funding would be needed to both meet these needs and, at the same time, curtail the practice of transferring enhanced payments back to State treasuries." 66 Fed. Reg. 3155.

The prior Secretary had noted another problem with the 150 percent Rule: the difficulty in establishing a reporting system that would assure the agency that the higher payments would "be retained by these hospitals to allow them to provide needed services to the Medicaid population." She concluded that such a system could not be created because it would be too difficult to administer. *Id.* at 3188.

> Our intent is to develop and enforce a reporting requirement that is not overly administratively burdensome on States or providers, yet sufficient to help us assess what payments are made to facilities in comparison to their UPL and, to the extent possible, ensure Medicaid payments are retained by providers to offset the costs they incur in furnishing covered services to Medicaid patients. After giving consideration to the [public] comments, we have decided not to require reporting of these data at this time.

*Id.* So the reporting requirements proposed and ultimately included in the regulations at 42 C.F.R. §§ 447.272(f) and 447.321(f) were not calculated to identify the very IGTs which result in artificially inflating the federal matching share without requiring additional State expenditures.

The new 2001 150 percent Rule was promulgated on January 12, 2001, just before the end of the previous administration. It called for an effective date of March 12, 2002.

The incoming Secretary had the above information in hand when the new State

plan amendments, intended to take advantage of the 150 percent Rule, started coming in. A large number of those plan amendments overtly required the hospitals "to either fund the State's share of the costs of the 150 percent UPL payment or transfer part of the UPL payment back to the State or local government." 67 Fed. Reg. 2607 and see Administrative Record for 2002 Rule, at 785, 788, 793, 801, 816, 818, 825, 1234, 1307.

The OIG report of September 2001, alerted the Secretary to the past history of IGT abuses and the rapid proliferation of such programs under the old regime. The Report stated that to the extent that States could use such enhancements to artificially inflate the federal match (with no real State contribution) "the rapid growth of these enhanced payment programs threaten the stability of the Medicaid program." *See supra.*

The OIG Report identified evidence of the kind of abusive IGTs that CMS had discussed in its July 2000 letter. With respect to the new 2001 150 percent UPL Rule which was to go into effect in March 2001, the OIG concluded that while "these modifications will help close the loophole in the Medicaid regulations" still the "financial mechanism used by the States would continue, albeit on a smaller scale." According to the OIG Report, the new "regulations limit but do not end the States' manipulation of the Medicaid program." OIG Report at iii (2002 Rule Administrative Record at 22 and 36). The OIG therefore recommended that the Secretary "reconsider capping the aggregate upper limit at 100 percent for all facilities rather than the 150 percent allowance for non-state owned government hospitals." *Id.* at 15 (2002 Rule Administrative Record at 39).

> We believe the public hospitals would receive adequate reimbursement to provide services to Medicaid beneficiaries and uninsured patients by (1) retaining 100 percent of the State and Federal Shares of the enhanced Medicaid payments up to the aggregate limit payable under Medicaid payment principles, and (2) receiving and retaining 100 percent of the State and Federal shares of the allowable DSH payments.

The defendant Secretary found the OIG's Report valuable and concurred in the recommendation that the New Administration "reconsider capping the aggregate upper payment limit at 100 percent for all facilities." He thereupon published the new proposed rule for notice and comment and promulgated the final rule on January 18, 2002, reducing the 150 percent limit to 100 percent as recommended.

Although the arbitrary and capricious argument has given the Court the most difficulty throughout this proceeding, the Court is now comfortable with the following ruling. Given all the evidence before the Defendant Secretary, the Court finds and concludes that he made a rational, reasoned decision, well within his discretion, that the 2001 150 percent rule left room for abusive financing transactions that have the potential to disrupt and destabilize the Medicaid system. The Court further finds and concludes that the Secretary's belief that the 2002 UPL will prevent the systemic diversion of Medicaid dollars by the states to non-Medicaid uses is adequately supported by the administrative record.

When Plaintiffs point to the financial harm that might result from lowering the UPL to 100 percent, one must keep in mind that it is the duty of the Secretary not to permit the expenditure of Medicaid resources for non-Medicaid purposes. And, even accepting that payments to keep hospitals open and staffed in order to provide care for Medicaid eligible persons is an entirely proper Medicaid purpose, still the information in front of the Secretary

clearly showed that the loophole he was trying to further close had been used to pay for entirely non-Medicaid purposes. This latter type of harm he must accept as simply the unfortunate consequence of doing his duty.

It is interesting to observe that, if the prior Secretary had adopted this same 100 percent rule, this record, under the applicable standard of deference, would have adequately supported that decision. But the same record also adequately supported the 150 percent decision actually made. The prior Secretary expressed doubts whether the 150 percent rule would adequately deal with the "kickback" problem but nonetheless went along with the "compromise." The new Secretary concluded that the 150 percent rule would not adequately deal with the problem and therefore opted to remove the loophole which created this potential for abuse. Both decisions are rational ones. Neither is arbitrary or capricious. Neither would constitute an abuse of discretion.

**(b) Sufficiency of the 100 Percent Rule**

 We now turn to the issue of the adequacy of the record to support the Secretary's conclusion that the 100 percent UPL is "more than sufficient to assure adequate access to services for Medicaid beneficiaries at public hospitals."

One would naturally assume that what is needed is a Rule which will reimburse all Medicaid facilities for 100 percent of their Medicaid expenditures, neither more nor less. The Medicaid program is for the indigent. Unlike Medicare, it is an entitlement program. So, when those qualifying persons receive medical or health services, the cost thereof is paid to the health care provider from Medicaid resources supplied by the federal government and non-federal sources (the State, counties, cities and private entities). The law requires that the State Medicaid plans assure that such payments "are consistent

with efficiency, economy, and quality of care." 42 U.S.C. § 1396(a)(30)(A). But that same law requires that the payments be "sufficient· to enlist providers so that care and services are available under the plan at least·to the extent· that such care and services are available to the general population in the geographic area." *Id.* It is this latter provision that is ordinarily used to justify supplemental payments of the type discussed above. This forms the basis for the "access" argument. The payments to these city and county hospitals, most of which are safety-net hospitals, must not only be enough to reimburse for the services actually rendered to Medicaid patients, those payments must also be adequate' to assure that those hospitals survive, thereby providing access to such services by Medicaid patients.

The Court notes that in the *Medicare* program certain hospitals receive similar supplemental payments (in addition to their "per diagnosis" payments) in those instances where Medicare recognizes certain special public services that those hospitals provide, such as medical education. According to Plaintiffs' counsel, during oral argument, supplemental payments for both the direct and indirect costs of medical education may be paid in that program. The Court also is advised that Medicare—a federally administered program—has its own disproportionate share (DSH) program whereby hospitals that are primarily serving poor, non-paying patients may receive supplemental payments.

According to Plaintiffs' counsel, the Medicaid DSH program is "completely different" from the Medicare DSH program. She stated that the Medicare program had a complex formula by which one can clearly calculate the payments due under that program. So far as the Court can determine, the Medicaid program, on the other hand, provides very little guidance from

which one could objectively determine whether excess "access" payments might be justified. The following colloquy during oral argument illustrates the point:

> THE COURT: Let me interrupt you there again. You say this money could go to non-Medicaid purposes. Say they kept it, and they are a poor hospital. They have a lot of uninsured people, and so they apply it to health purposes, but not Medicaid purposes. So, in other words, is the Medicaid program, if you take the excess payments and give it to one of these hospitals that are suffering so badly and say, okay, you already have a hundred percent of your Medicaid program, now there's some additional money coming from Medicaid, and you can spend that on anything you think is worthy, is that right? Does the Medicaid program require it to be paid to Medicaid patients?
>
> MS. EYMAN: Yes, Your Honor. I believe so. And it goes back to the language that you quoted at the beginning, which is that payments have to be consistent with quality of care and ensure access for Medicaid beneficiaries. Now, if you are in a hospital that has a certain percentage of Medicaid patients but you are going to go under because the rest, you know, you don't have other sources of funds or just minimal other sources of funds and your Medicaid population may be 50 percent of your patient population, but your nurses aren't going to accept 50 percent of their salary to stick around—
>
> THE COURT: It's keeping them open, keeping them in the game.
>
> MS. EYMAN: Medicaid has an interest in keeping them not only in the game. I don't think we're talking about the difference between having a hospital open and closing its doors, although in some cases that's what we're talking about, but also having an adequate hospital that has facilities, that can meet community needs, that can establish clinics in the community, for example, that can help people to get preventive care before having to, you know, go and seek care in the emergency room when their situation has become acute, for having quality care.
>
> THE COURT: Does one of these hospitals have to make a showing that essentially access to Medicaid services is going to be adversely affected if we don't have these supplemental payments?
>
> MS. EYMAN: No. That's what Congress left to the states to determine.

Transcript of Hearing, dated April 10, 2002, at 25–27.

Pertinent also is the discussion during the oral argument wherein Plaintiffs' counsel stated that IGTs are a part of the Medicaid statute and cannot be restricted without Congressional approval.

> THE COURT: It's not, I gather, that they are trying to prevent intergovernmental transfers, this method of using it to enhance the payments. For instance, there was some talk of treating them as refunds or something, and therefore that they would not have the benefit of enhancement. And that wouldn't stop the transfers, but it would stop the vice, which is to essentially raid the federal fisc. That's the way the defendants put it.
>
> MS. EYMAN: Right. And I haven't reviewed the legality of that proposal. But I do know that CMS' response to that suggestion was that, you know, we kind of tried that, but when it's been appealed through the internal agency appeals process, the departmental review board has said, You haven't given adequate notice that you are going to do that. Again, it goes back to this issue of the lack of any kind of guidelines. Another thing they can do is collect the data they said they were going to col-

lect. If that's not sufficient, they can collect additional data.

THE COURT: What is this restriction upon their ability to get data? They talked about they delayed doing it or you have to do something.

MS. EYMAN: The OMB approval. I think—the government may have to correct me on this—but my understanding is that the Paperwork Reduction Act requires them to go through an approval process before they can collect any data. And to get OMB approval, they need to issue it for public comment and that kind of thing. It is a paperwork reduction act.

*Id.* at 44–45.

But even without any clear guidance as to when "access" supplemental payments might legitimately be paid to a hospital under the Medicaid statute, it would seem to follow that any such payments would have to be classified as "Medicaid payments" which would then, seemingly, be reimbursable under any 100 percent rule.[45] So interpreted, the 100 percent rule makes sense because amounts paid in excess of 100 percent would, by definition, have to be for non-Medicaid purposes.[46]

Independently of the above analysis, the Court finds itself in agreement with the following arguments of the Defendant supporting the rationality of the Secretary's conclusion that the 100 percent UPL Rule is more than sufficient to assure "adequate access to services for Medicaid beneficiaries." What is "adequate" is, indeed, albeit within limits, a judgment call as to which reasonable people might disagree.

We are dealing with an upper payment limit which applies in the aggregate to county and city hospitals. It is not a limit on each individual local hospital. State hospitals have been operating under such an aggregate limit of 100 percent of Medicare payment principles since 1987. 52 Fed.Reg. at 2603. Private hospitals also have been operating under the same limit since March 2001. 66 Fed.Reg. at 3148. And we know that many of these state and private hospitals are "safety net hospitals" that serve the same populations and provide the same services as do the county and city hospitals. And the prior Secretary found that the state and private hospitals receive adequate compensation under the 100 percent rule and saw "no basis for raising that level to 150 percent." 66 Fed.Reg. at 3155–56. Furthermore, the then Secretary acknowledged in the 2001 rule-making process that there was no "clear standard" against which the adequacy of the 150 percent rule for non-state public hospitals could be judged reasonable or unreasonable. The incoming Secretary took a new look and, on the basis of all of the information available to him, concluded that the 100 percent rule would meet the needs of the city and county hospitals just as it does for the state and private hospitals.

Under the 100 percent rule the states still have some flexibility "to make enhanced payments to selected public hospi-

---

**45.** Even the Defendant does not appear to be concerned about establishing a clear line between Medicaid and non-Medicaid expenditures. See the colloquy between the Court and counsel during oral argument. Transcript of Hearing, dated April 10, 2002, at 51–53.

**46.** It appears to the Court that the increasing efforts to use Medicaid funds to assist in taking care of the pressing medical needs of the uninsured and other non-Medicaid populations has been a driving force behind the misuse of, first, the DSH program, and, second, of the UPL supplemental payment programs. While the objectives of such efforts may be laudable, they cannot be squared with the necessity to maintain the integrity of the boundaries of the Medicaid program.

tals under the aggregate limit." 67 Fed. Reg. at 2603. As stated by the Defendant in his Memorandum in Support of his Motion for Summary Judgment:

> For instance, if (as plaintiffs allege) "several" public hospitals in Arkansas would be "jeopardized" by a 100–percent limit ... the state could increase payments for those particular hospitals and decrease payment levels at other county and local hospitals (perhaps in more affluent parts of the State) where the low-income patient load was less heavy. The same would be true with respect to the county hospital in Los Angeles, ... the municipal hospital in San Francisco, ... or any of the other hospitals in plaintiffs' list of examples. There is no reason to merely suppose that state governments will be indifferent to the special needs of particular urban or rural hospitals in deciding how aggregate medicaid payments will be allocated among non-state public hospitals. An equal and across-the-board reduction in Medicaid payments for county and local hospitals—the assumption on which all of plaintiffs' fiscal speculations are apparently premised—is neither mandated nor even contemplated by the 100–percent rule.

*Id.* at 39–40.

Many of the State plan amendments submitted in connection with the implementation of the 2001 150 percent UPL Rule require, or contemplate, that the city or county hospitals receiving the 150 per-

cent payments will kick-back at least some of the money through IGTs. Note, e.g., the Georgia plan. And Plaintiffs acknowledge that even in Arkansas such hospitals contribute to the non-federal share of Medicaid expenditures by kicking back a portion of their funding to other entities (*See* Plaintiffs' Brief, at 7). If such hospitals need in excess of 100 percent, states can help simply by stopping the requirement of such kick-backs.

The Secretary also points to the availability of DSH payments to mitigate any adverse affect occasioned by the 100 percent rule. The Court notes that Congress created the DSH program to specifically address the problems of those hospitals which serve a disproportionate share of poor and low income patients. If such payments are inadequate, the parties should bring that to the attention of Congress rather than by attempting to deal with it indirectly through manipulation of the UPLs.[47]

Given all of the evidence before the Defendant Secretary, the Court finds and concludes that he made a rational decision, well within his discretion, in concluding that the 100 percent UPL would be sufficient to assure adequate access to services for Medicaid beneficiaries at non-state government-owned public hospitals.

#### (c) The Equity Rationale

■ The final basis for the Secretary's decision to reduce the 150 percent UPL for county and city hospitals to 100 percent

---

**47.** Plaintiffs argue that DSH payments in Arkansas are entirely inadequate. Defendant states that is because Arkansas did not get on the old DSH abusive payment band-wagon. When Congress in 1991 put a stop to those abuses, it capped DSH payments at roughly the 1982 level. According to Defendant, this had the ironic effect of benefitting those states that had been quickest to inflate DSH payments by effectively consolidating their gains. *See* Bob Graham, *Medicaid Reform: Saving*

*an American Success Story*, 23 Fla. St. U.L.Rev. 917 (Spring 1996). States like Arkansas, which had been slow to catch on to the DSH loophole, came out on the short end of the stick. *See* Teresa A. Coughlin and David Liska, The Medicaid Disproportionate Share Program: Background and Issues, at 3. The Defendant notes the disparity: in 1992, DSH payments accounted for 43 percent of Louisiana's Medicaid program but only 1 percent of Arkansas' program. *Id.*

was to "restore equity," i.e., to bring the payment standard for city and county hospitals in line with those for state and private hospitals. As pointed out above, many states and private hospitals are considered "safety net hospitals" while some city and county hospitals are not. State and private hospitals are limited to 100 percent. The Secretary concluded that there was no basis for giving an enhanced upper payment limit to only one category, particularly so since he had already determined that the 100 percent UPL was adequate to meet the needs of city and county hospitals as well as the needs of the state and private hospitals.

Again, the Court finds and concludes that, upon the entire record before the Secretary, his objective to create "equity" by reducing the 150 percent limit for county and city hospitals to 100 percent was a rational decision within his lawful discretion.

### D. The Regulatory Flexibility Act

 Finally, the Plaintiffs contend that the 2002 UPL Rule violates the Regulatory Flexibility Act (RFA) and the Social Security Act. The RFA provides that when an agency is required to publish a general notice of proposed rule-making for a proposed rule, the agency "shall prepare and make available *for public comment an initial* regulatory flexibility analysis," unless the head of the agency certifies that the rule will not have a significant impact on a substantial number of "small entities."[48] 5 U.S.C. § 603(a) (emphasis added), § 605(b). Each initial regulatory flexibility analysis shall contain:

(1) A description of the reasons why agency action is being considered;

(2) A statement of the objectives of, and legal basis for, the proposed rule;

(3) A description of and, if feasible, an estimated number of small entities to which the proposed rule will apply;

(4) A description of the projected compliance requirements of the proposed rule;

(5) An identification, to the extent practicable, of all relevant federal rules which may duplicate, overlap, or conflict with the proposed rule; and

(6) A description of any significant alternatives to the proposed rule that would minimize any significant economic impact of the proposed rule on small entities.

*See* 5 U.S.C. § 603(b)-(c).

In addition, when an agency promulgates a final rule, after publishing a general notice of proposed rule-making for a proposed rule, "the agency shall prepare a *final* regulatory flexibility analysis," unless the head of the agency certifies that the rule will not have a significant impact on a substantial number of small entities. 5 U.S.C. § 604(a) (emphasis added), § 605(b). Each final regulatory flexibility analysis shall contain:

(1) A statement of the need for, and objectives of, the rule;

(2) A summary of the significant issues raised by the public comments in response to the initial regulatory flexibility analysis, a summary of the assessment of the agency of such issues, and a statement of any changes made in the proposed rule as a result of such comments;

(3) A description of and an estimate of the number of small entities to which the rule will apply or an explanation of why no such estimate is available;

(4) A description of the projected compliance requirements of the rule.

---

**48.** HHS has conceded that for the purposes of the RFA, all hospitals are considered small entities. 67 Fed.Reg. 2602, 2609.

*(5)* A description of the steps the agency has taken to minimize the significant economic impact on small entities consistent with the stated objectives of applicable statutes, including a statement of the factual, policy, and legal reasons for selecting the alternative adopted in the final rule and why each one of the other significant alternatives to the rule considered by the agency which affect the impact on small entities was rejected.

*See* 5 U.S.C. § 604(a); *see also National Ass'n of Psychiatric Health Sys. v. Shalala*, 120 F.Supp.2d 33, 42 (D.D.C.2000).

Similarly, the Social Security Act provides that when HHS publishes a proposed rule under the Medicaid statute that may have a significant impact on the operations of a substantial number of rural hospitals, HHS must prepare a regulatory impact analysis. Such analysis shall describe the impact of the proposed rule on such hospitals and shall set forth the information required by the initial regulatory flexibility analysis noted above. *See* 42 U.S.C. § 1302(b)(1).

The Plaintiffs initially contended that the Defendant violated the RFA because the Agency's final regulatory impact analysis assessed only factors that will mitigate the harm to hospitals, and not the harm itself. Specifically, the Plaintiffs acknowledged that the Agency concluded that the rule could have a significant impact on as many as 1275 non-state government-owned or operated hospitals. They argued, however, that the HHS was in violation of the RFA because it failed to substantively assess the impact on such hospitals. In response, the Defendant argued that the

Plaintiffs sought to invent a legal requirement that does not exist, and is otherwise untrue. He stated that the final regulatory flexibility analysis does not require economic analysis, but only requires the agency to describe the steps it took to minimize the significant economic impact on small entities consistent with the stated objectives of applicable statutes.

The Court believes Defendant's position is correct. Indeed, the RFA requires only a "description of the steps the agency has taken to minimize the significant economic impact on small entities consistent with the stated objectives of applicable statutes." 5 U.S.C. § 604(a)(5). Consistent with this view, the Fifth Circuit has held: "the RFA plainly does not require economic analysis, but mandates only that the agency describe the steps it took to minimize the significant economic impact on small entities consistent with the stated objectives of applicable statutes.... Nowhere does it require, however, cost-benefit analysis or economic modeling." *See Alenco Communications, Inc. v. FCC*, 201 F.3d 608, 624–25 (5th Cir.2000).

In their Reply brief, the Plaintiffs appear to abandon the argument that the Defendant violated the RFA by assessing only factors that will mitigate the harm to hospitals, and not the harm itself. Rather, the Plaintiffs now contend that the final regulatory impact analysis *fails to describe the steps the agency has taken to minimize the significant economic impact on hospitals.* They argue that the mitigating factors the Defendant outlines—the transition periods provided for in the Rule and the DSH program—are part of the status quo, and are not mitigating steps as required by the RFA.[49] They assert that the

49. As noted, the final regulatory analysis expressly recognizes that the new rule will have a significant impact on hospitals, and that approximately 1275 hospitals could experience reductions in Medicaid enhancements from the state. However, the analysis also states that the rule will permit states to set

"fair and appropriate rates" for services provided to Medicaid beneficiaries, and that "for those states using the enhancements largely or exclusively as a means of generating inflated FPP through intergovernmental kickbacks, the effect of the ability of hospitals to provide Medicaid services would be small or non-

Defendant's analysis fails to discuss any affirmative steps that the Agency has taken or intends to take to mitigate the injury that the 2002 UPL Rule will cause to public hospitals.

In response, the Defendant contends that the final regulatory impact analysis adequately describes the steps the agency has taken to minimize the significant economic impact on hospitals. The Defendant asserts:

> The regulatory flexibility analysis in the final rulemaking notes that the impact of the rule on small entities was already mitigated by the availability of $8.4 million in DSH payments for safety-net hospitals, recent increases in DSH payments, and the fact that states could reduce the impact of the rule by ceasing to require intergovernmental transfers and simply letting non-state public hospitals use Medicaid payments for treatment of Medicaid beneficiaries in their facilities. The Secretary also noted that he had previously taken the additional step of allowing generous transition periods for states that already had enhancement programs in place. Plaintiffs do not suggest what other steps could have or should have been considered, other than perhaps to simply not reduce the upper payment limit in the first place.

In the alternative, the Defendant contends that the RFA does not require the Secretary to take any particular mitigating steps.

> In any event, the RFA does not require an agency to take *any* particular *steps* to minimize the economic impact of a regulation on a small business. It merely

requires "a description of the steps the agency *has taken* to minimize the significant economic impact on small entities consistent with the stated objectives of applicable statutes, including a statement of the factual, policy, and legal reasons for selecting the alternative adopted by the final rule and why each one of the other significant alternatives to the rule considered by the agency which affect the impact on small entities was rejected." 5 U.S.C. § 604(a)(5) (emphasis added). If there were no steps that could—or, in the Secretary's judgment, should—have been taken to minimize the impact on small businesses, then the statutory requirement would have been met simply by reporting that information. A description of the alternatives considered and rejected by the Secretary is plainly provided at 67 Fed. Reg. At 2609–10. Thus, all of the requirements of the RFA were clearly satisfied here.

The Court agrees.

Finally, the Defendant further asserts that even if the Agency failed to comply with the final regulatory flexibility analysis requirements, such circumstance would not warrant the invalidation of the 2002 rule if the Court found that rule would be in the "public interest." *See* 5 U.S.C. § 611(a)(4)(B). Again, the Court agrees with Defendant. Clearly, any rule, such as the 2002 UPL Rule, which is adopted for the purpose of enhancing the fiscal integrity of the Medicaid program would be in the public interest. Thus, after a thorough review of the administrative record, the Court finds and concludes that the Defendant Secretary, in proposing, processing,

---

existent, if, out of concern about those hospitals' ability to provide services, the states eliminated those kickbacks." Further, in states where such hospitals are already allowed to keep the enhancements for legitimate Medicaid purposes, the analysis found

that the effect would be mitigated by additional factors, such as: (1) receipt of DSH payments and (2) lengthy transition periods. Finally, the analysis includes other alternatives that had been considered and rejected.

and adopting the 2002 150 Percent UPL Rule followed and complied with both the Regulatory Flexibility Act and the Social Security Act. Therefore, the Plaintiffs' challenge on these grounds will be denied.

### E. Congressional Review Act

Finally, the Court dealt with this issue on the record during the oral argument concluding that the effective date of the 2002 UPL Rule is tomorrow, May 14, 2002. The Court expects the Secretary to accept and abide by that ruling.

### CONCLUSION

The Plaintiffs have simply not established their contentions (1) that the Defendant failed to include the concise statement of basis and purpose of the 2002 UPL Rule, as mandated by the Administrative Procedure Act; (2) that the 2002 UPL rule is arbitrary and capricious and an abuse of the Defendant's discretion under the Administrative Procedure Act; or (3) that the 2002 UPL Rule violates the Regulatory Flexibility Act and the Social Security Act. There being no genuine issues of material fact, the Defendant is entitled to summary judgment as a matter of law.

IT IS THEREFORE ORDERED that the Plaintiffs' Motion for Summary Judgment be, and it is hereby, DENIED.

IT IS FURTHER ORDERED that the Defendant's Motion for Summary Judgment be, and it is hereby, GRANTED. Judgment will be entered accordingly dismissing Plaintiffs' Complaint.

IT IS FURTHER ORDERED that all pending motions be, and they are hereby, DENIED AS MOOT.